Nott, J.,
delivered the opinion of the court.
This is an action brought for the breach of a contract for the sale of 250,000 bushels of corn in December, 1861, and the damages are laid at $63,488 79.
The chief witness for the claimants in this case is one John Hill. Among the papers which have come down from the War Department is an affidavit of this John Hill, which has been printed with the defendants’ evidence in the case. At the beginning of the trial the claimants’ counsel objected to this affidavit as incompetent evidence, and moved to strike it from thé record. The Assistant Attorney General contended,- on the contrary, that the affidavit was admissible to show that this Hill had been guilty of defrauding the government and was a person of bad character, and not to be believed. The witness had been twice examined before a commissioner of this court, once on the 2d October, 1867, and again on the 12th November following, and on both of these occasions the defendants were present by their counsel. At neither of them had any question been asked the witness, on his cross-examination, affecting his credibility or character, or in any way laying the foundation for using this affidavit to contradict him. The examinations, it is proper to add, were before the defence of the United States in cases in this court had been assigned by Congress to the Attorney General.
There is also another preliminary objection which is taken by the defendants. The same witness stated on his direct examination that from “ a memorandum taken by Mm from the claimants1 booksf he found the quantity of com delivered was 96,000 bushels; and again, that uby the bills of lading received at Locust Point it ayyears that there was received there 182,213 bushels of corn.'” Neither the claimants’ books nor the bills of lad- ■ ing were put in evidence; nor, on the other hand, does it appear that the defendants’ counsel, who was present at the examination, objected to this parol evidence, nor that he called for tlie books and bills of lading referred to by the witness. In fact, the first objection taken to this secondary character of the testimony *70 is that taken by the Assistant Attorney General on tlie trial or final bearing of tbe case.
Tlie testimony in tliis court is necessarily taken bjr depositions. In all matters of judicial discretion it is desirable that a liberal spirit shall prevail; but it is nevertheless necessary that on all questions touching- the competency or relevancy of testimony, the principles which govern courts of the common law shall be maintained. It is therefore a matter of some importance to the parties to know when and where objections to testimony should be taken.
So far as the regularity of the deposition itself is concerned, Buie 35 provides that all objections must be filed within 30 days after notice of filing the deposition has been given. And apart from the rule, it is obvious that where the objections go only to the manner or form of taking or returning the testimony, the opposing party should either file his objections or move to suppress the deposition befdre the hearing of the case. The rule further provides that “no other objections to the deposition will be considered on the hearing of the cause than such as would be available in a court of the common law if the witness were produced for examination in court.”
Yet the question still recurs, whether objections need be made to the admissibility of testimony until the case is actually on its final hearing. We think, with regard to this, that a twofold rule should prevail. Objections which go merely to the form of the question should be taken at the examination: for a leading question is proper if the adverse party does not specially object. So, too, an objection to a witness giving the contents of a written instrument should be taken at the examination ; for secondary evidence is always admissible if it be not objected to; and. the objection enables the first party to produce the instrument or prove its loss. But of questions going to the competency or relevancy of testimony the rule should be different; for incompetency and irrelevancy are defects which cannot be cured by changing the form, and a party is bound to present his case or defence only upon evidence which, is both relevant and competent.
There is also a class of depositions taken upon written interrogatories, where neither party is, nor has a right to be present at the examination, (Buie 34,) and consequently where neither party can interpose objections. It often happens in these cases *71 that to a perfectly proper and. unobjectionable interrogatory the witness will answer by stating the contents of letters, books of account, or documents, without producing- them or accounting for their absence. To such cases we think Buie 35 is applicable. The secondary evidence would come within the terms u the form and manner of taking the testimony,” and the party .seeking to use such a deposition should give notice of the filing, and the opposing party wishing to object should file his objections within the time appointed. In case the former party should neglect to give the notice required by the rules, the opposing party would then be at liberty to take his objections at the beginning of the trial; for that would be the first opportunity given to him.
The right of a party to attack the character of a witness must be governed by substantially these principles. A wide latitude should be allowed to the government, for the Attorney General and his assistants cannot know the character of every witness called by every claimant; yet, nevertheless, a claimant is entitled to know that his witnesses are to be assailed, and a witness should have the opportunity of explaining his conduct or defending his character. In the case before us the affidavit sought to be introduced must have been in the defendants’ possession five or six years before the witness was examined; the witness was twice called by the claimants, and a double opportunity given to cross-examine him upon this subject. The defendants, having failed to do so when he was before the commissioner, cannot, with propriety, be allowed to attack his character now; and the motion of the claimants to strike out the affidavit as incompetent evidence for any purpose must be granted, and the motion of the defendants to strike out the parol evidence of the contents of the bills of lading must be denied.
Passing this preliminary question of evidence, we come to the facts of the case, which are these:
In December, 1861, a number of persons united in one proposal to furnish the government with a large quantity of hay, oats, and corn. The proposal was received by the United States quartermaster in Baltimore, and by him was transmitted to General Yan Yliet, senior quartermaster'of the army of the Potomac. The senior quartermaster returned it, with the recommendation that the proposals for the hay and oats be accepted. Accordingly, a written contract was executed on *72 the 17th December by a number of parties in severalty, and, among others, by the claimants in this case, who, under the name of Hughes, Fuller & Co., agreed to furnish 1,875 tons of hay and 250,000 bushels of corn. The corn was “ to be merchantable, sound, and dry; to bo delivered in quantities from time to time, and all to be delivered within 45 days.” It was also expressly provided that the defendants were “to receive the hay and corn from the persons constituting the party of the second part as the same are offered for delivery, claiming five lay days after being reported, if necessary, and to pay for the same as before specified.”
The entire quantity of this corn, therefore, was to have been delivered within 45 days from the 17th December — that is to say, by the 1st February following; and it was to have been all received by the defendants as tendered; or within “five lay days” thereafter.
The evidence satisfies us that the claimants were ready to comply. Before the 1st February following, 182,215 bushels of corn had been shipped to Locust Point, the place of delivery, and lay there stored upon the claimants’ wharf. The remainder of the 250,000 bushels they had purchased, and were ready to deliver. But during the 45 days of the contract only 220 bushels were in fact accepted by the defendants; the reason of which was that the quartermaster at Washington was unable to provide storehouses for the corn already purchased, and was compelled to order the quartermaster at Baltimore not to send any more forward, or to send limited quantities.
After the expiration of these 45 days of the contract the claimants delivered, and the defendants accepted, corn at various times running through a period of several months; so .that the aggregate delivered by the one party and accepted by the other was 96,781 bushels, and the amount not delivered or accepted was 153,219 bushels. At this time corn had fallen, so that if the claimants had sold this unaccepted quantity the difference between the market and the contract prices would have been about 10 cents per bushel.
But the claimants did not sell the corn. It remained piled upon their wharf at Locust Point, imperfectly prptected from the weather, though the claimants did exert themselves to have it properly covered by sheds and canvas. 38,810 bushels were shipped to the Potomac and sold to other parties, and 9,400 *73 bushels intended for the Potomac market were lost on a transport wrecked on the voyage. After the 1st April the corn began to beat, and the remainder of the 182,000 bushels (85,653 bushels) was so nearly lost that it did not average a price of more than 13 cents per bushel. Subsequently the claimants delivered, through certain of their friends, 48,210 bushels, which make up the 96,781 bushels accepted ami'received by the government upon this contract.
Such being the narrative of the corn, it is necessary to inquire into the acts of the parties.
And first, the defendants never positively refused to receive the corn, but, on the contrary, the quartermaster kept constantly holding out the hope and giving forth assurances that he would be able to receive it soon. The claimants, on their part, never made a formal tender of the corn; nor did they give notice that they held it upon their wharf at the risk ot the defendants. Tet the testimony of several respectable merchants, and of the quartermaster himself, shows that the claimants frequented his office, “ complaining’ bitterly that the government did not fulfil their contract by receiving their grain at the time stipulated.” They, however, did not abandon the corn to the defendants, but continued to exercise over it acts of ownership, such as erecting sheds and shelter. They also shipped a part to a new market as early as the 1st March, being a month and more before the heating began. This new market was an unusual and dangerous one, being on the Potomac and through the rebel blockade. When the corn began to heat, the claimants made ineffectual efforts to save it — necessarily ineffectual by reason of the large quantity accumulated on their wharf — and they shipped some of it back to Philadelphia, which was spoiled before it could be unloaded and sold.
The principles of law which we think should govern the case upon the foregoing facts are these:
1. Under the cases of Clark & Co., (1 C. Cl’s R., 243,) and Gibbons, (2 Id., p. 241,) the claimants were not bound to bring all of their corn to Locust Point and make a formal tender of it to the defendants’ quartermaster. It was sufficient for them to have tendered a part within the time fixed by the contract, and to have made arrangements and been ready to supply the rest within the prescribed time.
*74 2. When tbe time fixed for tbe acceptance of tbe com by tbe defendants expired, tbe claimants bad tbe legal right to throw tbe corn upon tbe defendants and seek tbe contract price, or to dispose of it as tbe trustees of tbe defendants, crediting them tbe • amount which it brought and looking to them for tbe balance which might remain. But in making this election, their conduct must be clear and unmistakable, so as to put tbe defendants upon their guard, and have them informed of tbe course which they, tbe claimants, intended to pursue. Tbe course which tbe claimants did pursue was clear and unmistakable, and shows that they elected to bold tbe corn for their own security and as tbe trustees of tbe defendants.
3. In so acting as trustees, tbe claimants were bound to proceed in tbe manner prescribed by tbe well-known and well-settled rules of law which fix tbe duties and responsibilities of trustees in like circumstances. They bad no right to ship tbe corn to an unusual and dangerous market, nor to bold wliat, under tbe circumstances, was a perishable article for tbe chance of realizing a better price. Tbe testimony of tbe claimants’ own witnesses shows that new corn, massed as this was, was certain to beat; that if it bad been put xiromptly upon tbe market it might have been almost entirely saved; and that government corn heated at tbe same time was sold for 20 cents a bushel in tbe same market. We think, therefore, that however well-intended tbe claimants’ conduct was, it was nevertheless of that improvident and speculative character for which tbe law bolds vendors responsible.
4. It follows, from these conclusions, that tbe claimants should not recover for tbe corn which spoiled and was partially lost in their bands; but that they should recover tbe fair profit which they would have made upon all tbe corn which tbe defendants refused or neglected to receive under tbe contract. This we have found to be 10 cents per bushel, and tbe quantity 153,219 bushels. Therefore, the judgment of tbe court is that tbe claimants recover $15,321 damages.
Pecic, J., did not sit in this case, and took no part in tbe decision.