H. W. ARMSTRONG *et al. vs.* ST. PAUL & PACIFIC COAL & IRON COMPANY.

## July 1, 1891.

**Contract—Sale and not Agency.**—*Held* that, under the facts of this case, the parties did not occupy the relation of principal and agent, but of opposing contracting parties, as purchaser and seller.

**Same—Repudiation by Buyer—Action by Seller for Loss of Profits.** Where the purchaser notifies the seller that he will not pay the contract price for the property if delivered, but only a less price, it amounts to a repudiation of the contract, and absolves the seller from the duty of delivering the property; and he may have his action for the loss of profits on the sale.

### ON REARGUMENT.

Submitted on briefs Jan. 11, 1892. Decided Jan. 18, 1892.

**Repudiation of the Purchase by Notice that he will not Pay.**—In the case of an executory contract for the sale of goods to be paid for after delivery, if during the time for delivery the buyer notifies the seller that he will not pay the contract price for the goods, but only a less price, the seller has a right to act on this as a repudiation of the contract, and stop delivery; and, if thus acted on, he has his action for damages.

**Such Notice Erroneously Given.**—Such conduct on the part of the buyer is none the less a repudiation of the contract because not willful, but

the result of an error as to its terms, or because accompanied with a profession of willingness to perform the contract according to his erroneous construction of it.

Appeal by plaintiffs from an order of the district court for Ramsey county, *Wilkin*, J., refusing a new trial after verdict of $3,690.03 for defendant, on the counterclaim pleaded in the answer.

The action was brought to recover $20,239.25, damages for defendant's refusal to furnish and deliver to plaintiffs upwards of 6,000 tons of anthracite coal at Minneapolis, free on board the cars, in accordance with an alleged modification, by the telegrams considered in the opinion, of a contract made June 26, 1885, the substance of which is stated in the opinion. The issues joined in the action were tried July 10, 1886. Proceedings were stayed from time to time, until November 14, 1887, at which date a case containing exceptions was signed. A motion was made by plaintiffs for a new trial. It was taken under advisement, and on September 16, 1890, denied. From that order of denial plaintiffs appealed to this court. After the decision of this court filed July 1, 1891, the plaintiffs presented a petition for reargument, and it was granted October 7, 1891. The parties then submitted upon briefs filed January 11, 1892.

*Hart & Brewer,* for appellants, cited 2 Schouler, Pers. Prop. §§ 281, 282; Benj. Sales, §§ 564, 568, notes 4 and 9; *Phillpotts* v. *Evans,* 5 Mees. & W. 475; *Avery* v. *Bowden,* 5 El. & Bl. 714; *Cutter* v. *Powell,* 2 Smith's Lead. Cas. (9th Ed.) 1228, 1236, 1237, 1240; *Mersey Steel & Iron Co.* v. *Naylor,* L. R. 9 App. Cas. 434; *Midland Ry. Co.* v. *Ontario Rolling Mills,* 10 Ont. App. 677; *Winchester* v. *Newton,* 2 Allen, 492; *Fay* v. *Oliver,* 49 Amer. Dec. 764; *Smoot's Case,* 15 Wall. 36; *Dingley* v. *Oler,* 117 U. S. 490.

*John B.* and *Walter H. Sanborn,* for respondent, cited *Haines* v. *Tucker,* 50 N. H. 307; *Smith* v. *Lewis,* 24 Conn. 624, 26 Conn. 110; *Chamber of Commerce* v. *Sollitt,* 43 Ill. 519; *Fox* v. *Kitton,* 19 Ill. 519; *Bunge* v. *Koop,* 48 N. Y. 225; *Cort* v. *Ambergate, etc., Ry. Co.,* 17 Q. B. 127; *Hochster* v. *De la Tour,* 2 El. & Bl. 678; *Planche* v. *Colburn,* 8 Bing. 14; *Ex parte Stapleton,* 10 Ch. Div. 586; *Frost* v. *Knight,* L. R. 7 Exch. 111; *Burtis* v. *Thompson,* 42 N. Y. 246; *Danube, etc., Ry. Co.* v. *Xenos,* 11 C. B. (N. S.) 152, 13 C. B. (N. S.)

825; *Jones* v. *Barkley*, 2 Doug. 684; *Gill* v. *Newell*, 13 Minn. 462, (Gil. 430;) *Textor* v. *Hutchings*, 62 Md. 150; *Canda* v. *Wick*, 100 N. Y. 127; *In re Phœnix Bessemer Steel Co.*, 4 Ch. Div. 108; *Grove* v. *Donaldson*, 15 Pa. St. 128; *Withers* v. *Reynolds*, 2 Barn. & Adol. 882; *Cutter* v. *Powell*, 2 Smith, Lead. Cas. (9th Ed.) 1228, 1236; 1237, 1240; *Stephenson* v. *Cady*, 117 Mass. 6 : *Fletcher* v. *Cole*, 23 Vt. 114; *Morgan* v. *Bain*, L. R. 10 C. P. 15; *Costigan* v. *Mohawk & H. R. Co.*, 2 Denio, 609; *Follansbee* v. *Adams*, 86 Ill. 13; *Canney* v. *Brown*, 40 Minn. 461; *Palmer* v. *Breen*, 34 Minn. 39.

MITCHELL, J.   The records and briefs were suggestive that this case might be a complicated one, but examination proves that the material facts are few and practically undisputed, and that the legal questions involved are very simple.   In June, 1885, Armstrong & Truesdell, (now Armstrong & Co., plaintiff Mather having succeeded Truesdell,) local coal dealers in Minneapolis, agreed to buy of defendant 10,000 tons of anthracite coal, at the price of $6.80 per ton for nut and stove, and $6.55 for egg and grate, to be received and paid for during the time intervening between the date of the contract and May 1, 1886.   This contract remained unmodified until August 7, 1885.   By that time the market in Minneapolis had become quite demoralized by strong competition between rival coal companies, and consequently it became to the mutual interest of both parties that the defendant should make some concessions to its customers to enable them to stay in the market and meet the cut prices.   In this situation of affairs, Truesdell went to Chicago, and had a conference with the general manager and vice-president of the defendant company.   It was there agreed that Armstrong & Truesdell might sell coal for actual consumption, for cash and immediate delivery, at $6.50 and $6.75, and make daily reports of what they sold, until notified to stop, and that defendant would furnish them the coal so sold and reported at 75 cents a ton less than the prices so made.   There is no controversy over this, as defendant admits and has always recognized this modification of the contract.   Truesdell thereupon wired instructions to this effect to his firm in Minneapolis, which is the first of the telegrams which appear in the record.   Subsequently, and on the same day, defendant's

agents further agreed with Truesdell that whatever coal Armstrong & Truesdell should sell and deliver the next day (which could not and should not exceed 200 tons) it would deliver to them under the contract at $4 and $4.25 per ton. Truesdell thereupon wrote the following telegrams in succession, and handed them to defendant's agents, who, after reading them, directed their office boy to take them to the telegraph office for transmission:

"To Armstrong & Truesdell:

"Advertise in to-night and to-morrow's papers, for cash and immediate delivery to actual consumers only, coal at $4.75 and $5.00. Take as few orders as possible; then stop and wait for orders. [Signed]   V. TRUESDELL."

Also:   "At the five-dollar price do not let opposition place any orders with you; know where coal is going; close taking orders after to-morrow; let me know what is going to-day.   [Signed]   V. TRUESDELL."

Also: "Do not take any more orders for coal at the five-dollar price than what you can fill to-morrow; guaranty nothing; we start back to-night.   [Signed]   V. TRUESDELL."

All of these telegrams were received by Armstrong—the member of the firm who was attending to the business at home—during the afternoon of the same day, (August 7th.)   He proceeded in accordance with his understanding of the meaning of those instructions, and the next day took orders for 4,300 tons at the $4.75 and $5 rates. Right here is where the controversy between the parties arose; the plaintiffs claiming that defendant was bound to furnish them the whole of this 4,300 tons at the $4 and $4.25 rates, while defendant's contention is that it was only bound to furnish 200 tons at those prices.

Plaintiffs' argument is that the relation of principal and agent existed between them and the defendant, they being its agents for the sale of this coal, and consequently that defendant is responsible for these telegrams, which they claim are ambiguous on their face, and do not limit the sales on the next day to 200 tons, or what Armstrong & Truesdell could actually deliver on that day; that it is the duty of the principal to make his instructions free from ambiguity.

The trouble with this argument is that the premise upon which it rests is wholly unwarranted by the facts. There is nothing in the evidence even suggestive of the relation of principal and agent between the parties. On the contrary, they stood at arm's length, as opposing contracting parties, the plaintiffs as buyers and the defendant as seller. Plaintiffs sold this 4,300 tons for themselves, and not for the defendant. The arrangement as to prices was merely a reduction from those in the contract of June, made in order to enable plaintiffs to meet the cut rates, and still make 75 cents per ton on the coal. There was no ambiguity in the terms of agreement actually made between defendant and Truesdell, upon whom, and not upon the defendant, it was incumbent to see that the terms of this agreement were correctly and intelligently communicated to his partner at home. The mere fact that, when Truesdell showed defendant's agents what he had written, they made no objections to the contents, and, as a matter of accommodation to him, directed their office boy to see that they were forwarded, did not make the defendant responsible for the telegrams; for no duty devolved upon it to see that Truesdell had couched them in unambiguous language. It is claimed, however, that, after the defendant's agents knew that Armstrong had sold the 4,300 tons at these cheap rates, they ratified it by certain alleged promises that plaintiffs should not lose anything by it, and that they would make it all right. But this rests upon the same false assumption of the existence of the relation of principal and agent between the parties. As there was no such relation, the doctrine of ratification has no application. Any such promises, if made, would be mere naked promises, and bind nobody. The court below was therefore clearly right in his view that the contract rights of the parties were correctly stated in the letter from defendant to plaintiffs under date of September 12, 1885.

This brings us to the question of the correctness of the action of the court in directing a verdict for defendant upon its counterclaim for damages by the refusal of plaintiffs to receive and pay for the balance of the 10,000 tons, under their contract of June 26th. No question is made here as to the amount of the verdict. The evidence is conclusive that the defendant kept the coal on hand,

and was ready and willing to deliver it at the prices named in the contract of June 26th, and requested plaintiffs to receive it under that contract, but that they claimed they were entitled to it for $4 and $4.25, and notified defendant, in effect, that, if the coal was delivered, they would pay no more for it unless at the end of a lawsuit. This conduct on part of the plaintiffs amounted to a repudiation of the contract, and absolved the defendant from the duty of delivering the balance of the coal, and gave it a right of action for its loss of profit on the sale. Benj. Sales, p. 558, note 9.

There was certainly no error in the court's refusing to permit plaintiffs to introduce their amended reply. We do not feel called on to go into the history of what had occurred previously on the trial, but, in view of all that had happened, it would have been almost an abuse of discretion to have allowed these amendments at the very close of the trial. Moreover, the amended reply set up no defense to the counterclaim, and some portions of it were wholly inconsistent with the allegations of the complaint.

Order affirmed.

(Opinion published 49 N. W. Rep. 233.)

On the reargument the following opinion was delivered:

MITCHELL, J. On the first argument of this case the main contention was as to which of the parties violated their contract, and the attention of the court was not specially called to any supposed distinction between what might be a defense to plaintiffs' claim and what would be necessary to entitle defendant to recover on its counterclaim. Hence it was rather assumed without much consideration that the facts which would defeat the one would sustain the other. In view of this, we granted a reargument of the question whether upon the facts the defendant was entitled to recover on its counterclaim. While undoubtedly there may be cases where the action of one party to a contract would be such as to constitute a defense if the other party was sued for failure to perform, and yet not sufficient to authorize the latter to abandon the contract himself, and, as

plaintiff, to entitle him to recover profits which he would have made if it had been fully performed, yet, after a careful re-examination of the evidence, we are satisfied that there is no room for the application of any such distinction in the present case.   The plaintiffs failed to recover because they had repudiated the contract to pay the contract price for the coal, and defendant's right to recover on its counterclaim rested upon this same repudiation.   That, where one party to an executory contract repudiates it by refusing to be bound by its terms, the other party may take him at his word, and act upon it by treating the contract at an end, and bring an action for damages for its breach, is, of course, elementary.   The only question is, what will constitute a repudiation?   The true test, stated generally, is whether the acts and conduct of the party evinced an intention no longer to be bound by the contract; and the fair result of the authorities is that it is not only an absolute refusal in words to perform a contract, but also any clear manifestation by words or acts of an intention not to perform it according to its terms, that will authorize the other party to treat this as a repudiation and bring his action.   Consequently, where the seller receives notice from the buyer that he will not pay the contract price for the goods, he has a right to treat this as a repudiation of the contract, stop delivery, and bring his suit for damages.   This is, in our opinion, just what the evidence in this case conclusively established.   The contract price of the coal was one sum.   The plaintiffs, in effect, said to defendant: "We will only pay for it another and less sum; in other words, if you go on and perform your side of the contract, we will not perform ours. You must go on and deliver the coal, but we will not pay you for it, as under the contract we ought."   The legal effect of this was not changed by the fact that it was coupled with a profession that they were ready and willing to perform the contract, for manifestly the "contract" which they asserted their willingness to perform was not the contract of the parties, but an entirely different one.   Neither did it make any difference, so far as concerned defendant's right to act on this as a repudiation, that it might not have been willful or fraudulent, but the result of a mistake as to the terms of the contract.   In planting themselves on their own construction of it, the

plaintiffs took their chances; and, as it was in fact incorrect, they must stand the legal consequences of their acts. It is doubtless true that there may be acts of default in the performance of the strict terms of a contract which would not evince any intention to repudiate its obligations, and which consequently the other party would have no right to treat as a repudiation. An example of this is *Mersey Steel & Iron Co.* v. *Naylor*, L. R. 9 App. Cas. 434, cited and relied on by plaintiffs. But this is clearly not such a case. There are also cases where one party, before the day of performance arrived, gave notice that he would not perform his contract, and yet the other party was held not entitled to recover damages, on the ground that he had not acted on the notice as a repudiation, but treated the contract as still on foot. *Avery* v. *Bowden*, 5 El. & Bl. 714, also cited by plaintiff, is an instance of this kind. But these cases turn on the fact that the party had not acted on the notice, which, as is said in one case, amounts to nothing until the time when the buyer ought to receive the goods arrives, *unless the seller acts on it in the mean time.* In the present case the defendants did act on the notice, and treated it as a repudiation of the contract, and stopped delivering the coal. The former opinion must therefore stand.

(Opinion published 50 N. W. Rep. 1029.)