# J. P. LASWELL et al., Respondents, v. NATIONAL HANDLE COMPANY, Appellant.

### St. Louis Court of Appeals, March 22, 1910.

1. **SALES: Contracts: Construction: Performance.** A contract of sale of the output of a mill for a fixed period, binding the buyer to take the output and to pay cash f. o. b. cars and stipulating for inspection at the mill, does not require the seller, in view of the course of business between the parties that the seller should not load until receiving shipping directions, to load on cars before receiving such directions, and where the buyer fails to give directions, the omission to load on cars does not defeat a recovery by the seller.

2. ———: ———: ———: **Performance.** But if the seller refuses to load, on receiving shipping directions, he fails to perform.

3. ———: ———: ———: ———. If a letter containing shipping directions was sent by the buyer but not received by the seller, and a little more than a month afterwards the seller wrote for advice and the buyer, though receiving the letter, failed to give directions, he was in default.

4. ———: ———: **Action for Breach: Specious Defense.** In an action for breach of a contract in refusing to accept and pay for goods, a defense that defendant did not take and pay for the goods because they were not loaded on cars as provided in the contract is specious, where defendant never took such a position in correspondence about the matter, but evaded taking any position, and later declared it was not bound to accept the goods because they were of a kind not mentioned in the contract.

5. **TENDER: Unnecessary, when.** A tender is unnecessary where the person to whom it should be made has shown that he will refuse it if made.

6. **SALES: Contracts: Action for Breach: Refusal to Accept Goods: Evidence: Inferences.** Where the owner of a mill entered into a contract with another whereby the former agreed to sell and the latter to buy the entire output of the mill, and the latter refused to accept and pay for a certain quantity of the output, and the mill was thereupon closed down, evidence, in an action for loss of profits that would have been made if the

147 App—32

contract had been carried out, that though plaintiffs were in debt, they could and would have borrowed money and thus have continued to operate the factory, but that defendant's behavior induced them to believe it would take no more deliveries, especially of a certain kind, as a result of which plaintiffs were deterred from manufacturing and finally after futile efforts to get defendant to accept the refused material were caused to cease offering to manufacture, was sufficient to warrant an inference that the cessation to manufacture was due to the refusal of said material and the well-founded belief of plaintiffs no such material would be accepted, rather than to inability to operate for lack of means or for lack of the price of the rejected material.

7. ———: ———: ———: ———: ———: ———. In such a case the jury might find from defendant's conduct in giving no shipping directions for certain material after it had passed inspection with other material, although often requested so to do by plaintiffs, that defendant had refused to accept and pay for said material.

8. ———: ———: Construction: Reasonable Time for Performance. Where a contract for the sale of the output of a mill stipulated for inspection at the mill and for cash payment, without fixing the time for inspection or payment, both parties were bound to rest content with reasonable conduct.

9. ———: ———: Breach: Recovery of Unearned Profits. A seller of the product of his mill for a specified time cannot recover unearned profits on the buyer's breach, unless the latter's conduct sufficed in contemplation of law to prevent the seller from further performance.

10. CONTRACTS: Recovery Notwithstanding Non-Performance. A party may be prevented from keeping a contractual obligation and yet remain entitled to the full benefits he would have derived from keeping it, if the other party renders it impossible for him to keep it, or directs him to desist from performance, or fails to keep a condition precedent, or expressly renounces the contract, or breaches covenants of such importance that the breach is equivalent to a renunciation.

11. ———: ———: Effect of Obligor's Failure to Pay Money Due. The prevalent rule is, that mere failure to pay money when due will not warrant him to whom it is due to no longer keep his engagement and permit a recovery as though he had.

12. ———: Construction: Dependent Stipulations. Stipulations in commercial transactions are generally treated as dependent and indivisible on the theory that such construction conforms to the

intention of business men who are accustomed to depend on prompt compliance with engagements and may be ruined by tolerating breaches.

13. **SALES: Contracts: Recovery Notwithstanding Non-Performance.** Where a seller of the output of his mill for a fixed period for delivery f. o. b. cars, terms cash and inspection at the mill, went in debt for his mill, machinery and timber, solely on the faith of the contract of sale, expecting to meet his liabilities with the money collected on installments of the output delivered, but did not insist on a proviso that carloads should be inspected and taken at stated intervals or to make those acts conditions precedent to further deliveries, the failure of the buyer to take and accept promptly a single carload would not of itself excuse the seller from going ahead and yet enable him to recover future profits.

14. ———: ———: ———. Where a contract of sale of the output of a mill for a fixed period is broken by the buyer, and the breach evinces an intention not to be bound by the stipulations whose non-observance will so far defeat the consideration for which the seller entered into the contract that to make the seller keep the agreement will amount to coercing him to perform on terms which he would not have accepted, he is released from his obligation, and may recover as though the contract had been carried out.

15. ———: ———: ———: **Facts Stated.** A contract for the sale of handles to be manufactured by the seller during a fixed period called for a variety of handles including one called "D-stem." During a part of the period the seller manufactured and delivered several carloads of handles of the varieties called for. A carload composed of 37,000 handles, of which 22,000 were D-stems, was not taken by the buyer, on the ground he was not obliged to take handles of the D-stem variety. Performance of the contract by the seller without manufacturing D-stem handles would entail on him a continual loss, as a proportion of every load of timber worked up would be wasted. *Held*, that the buyer's renunciation of its obligation to accept D-stem handles went to the root of consideration, amounted to an abandonment of the contract, and relieved the seller from his obligation further to perform.

16. ———: ———: **Breach: Measure of Damages.** Where a contract of sale of the output of a mill for a fixed period is so breached by the buyer as to release the seller from his obligation to perform, the measure of the seller's damages is the difference between the cost to him of manufacturing the goods and loading them on cars, as required by the contract, and the prices he was to receive for the goods.

17. **PLEADING: Reply: Joining Equitable and Legal Defenses in Same Count.** The joinder of a legal and an equitable defense in a single count of a replication is bad pleading.

18. **TRIAL PRACTICE: Reply: Equitable Defense: Asking Affirmative Relief: Hearing by Court.** Where defenses of a legal and one of an equitable nature are united in a single count of a reply, and affirmative relief in connection with the equitable defense is prayed, that matter should be heard and determined by the court.

19. **PLEADING: Election.** Where a reply to a counterclaim in an answer, which counts on the breach of a contract, pleads fraud in the procurement of the contract, as an equitable defense, and the non-performance of a condition precedent, as a legal defense, both defenses resting upon the same facts, only the defense which is best supported by the evidence ought to be insisted upon.

20. **SALES: Contracts: Condition Precedent.** A statement made by one party to a contract to the other party, that if the latter would sign it, he would take certain material from the latter, was not a condition precedent, so as to make the contract ineffective until the agreement had been complied with, there being no stipulation the contract should not go into effect until this agreement had been complied with.

21. ———: ———: **Rescission: Fraud.** Where one party to a contract makes a promise to the other party of something to be done in the future, with no intention to perform it, but with a fraudulent design to obtain the contract by giving the promise and breaking it, the adverse party may rescind on the ground of fraud.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley*, Judge.

REVERSED AND REMANDED (*with directions*).

*Faris & Oliver* for appellant.

(1) The court erred in refusing to admit relevant and competent testimony offered by the appellant. Type Foundry v. Printing Co., 3 Mo. App. 149; Strother v. Lumber Co., 200 Mo. 647. (2) The court erred in admitting irrelevant and incompetent testimony offered by the plaintiffs. The plaintiffs were

permitted to say over the objections of defendant what timber they had lost on account of the alleged breach of the contract by defendant in failing to take *vi et armis* the car of "junk." These matters were not such damages as occurred from the alleged acts of defendant. They were in no sense such as grew out of defendant's failure to accept the carload of "D-stems" and pay for the same. In short, they were not approximate damages, or such as could have been foreseen by defendant, from its mere failure to take a carload of handles from under the plaintiffs' mill shed and pay $530 for them. Applegate v. Franklin, 109 Mo. App. 293; Grattis v. Railroad, 153 Mo. 380; Fontaine v. Lumber Co., 109 Mo. 55; Saunders v. Brosius, 52 Mo. 50; Insurance Co. v. Boone, 95 U. S. 130; Tucker v. Railroad, 133 Mo. App. 129. (3) The court erred in overruling the objection to the offering of any testimony in this case. The petition did not set out any cause of action. The first count was for certain handles confessedly agreed to be delivered on board cars by plaintiffs, but which the petition avers were never taken, received or accepted by the defendant; but the petition, though counting as upon a complete sale and delivery, does not aver that said handles were ever loaded upon cars or offered to the defendant, as the contract pleaded specifically required and bound them to deliver same, *i. e.,* f. o. b. cars. It is elementary law that under this state of facts as set out in the petition by specific allegation and inference, there was no sale, no delivery, the title never passed to defendant and plaintiffs are not entitled to recover as upon a sale. Stresovich v. Kesting, 63 Mo. App. 57. For aught that appears, the prices may have risen on handles, and then instead of defendant's action injuring them, it might have been a blessing to plaintiffs in disguise. They could not by their own action or inaction increase the damages of defendant. Peck & Co. v. Roofing Co., 96 Mo. App. 212; Dietrich v. Railroad, 89 Mo. App. 36; Mahoney v.

Kansas City, 106 Mo. 39; Field on Damages, p. 19. (4) The court erred in overruling defendant's demurrer to the evidence, offered at the close of plaintiffs' testimony, and again offered at the close of all the evidence in the case. Lewis v. Insurance Co., 61 Mo. 534. (5) The court erred in instructing the jury, at the request of plaintiffs, as it did. (a) There was no proof upon which to bottom instruction No. 1, as given for plaintiffs. The mere absence of shipping directions did not, under the contract, furnish any legal excuse for the plaintiffs' default. This instruction improperly states the measure of damages. Had the defendant unlawfully taken the handles and converted them to its use, plaintiffs could have treated such conversion as a sale and recovered full value of the handles on a *quantum meruit*, but we are at a loss to see how the plaintiffs could do this under the facts here. Lumber Co. v. Warner, 93 Mo. 388; Halliday v. Lesh, 85 Mo. App. 285; Cobb v. Whitsett, 51 Mo. App. 146. (b) Instruction No. 2, given by the court for plaintiffs, is not the law under the facts here. The contract says the handles were to be delivered f. o. b. cars at Manila, Arkansas. It is not ambiguous and cannot be construed in the light of the acts of the plaintiffs. Bader v. Mill & Lumber Co., 134 Mo. App. 135; Brewing Co. v. Water Works, 34 Mo. App. 49; Drug Co. v. Saunders, 70 Mo. App. 221; Gas Co. v. St. Louis, 46 Mo. 121. (c) Instruction No. 3 states no legal measure of damages. Defendant, as has already been earnestly insisted, was not liable for hypothetical damages and loss of hypothetical profits arising from the unnecessary idleness of plaintiffs' mill. Peck & Co. v. Roofing Co., supra. (d) Instruction No. 4. for plaintiffs, as given by the court, is afflicted with the same vice as instruction No. 3, above discussed, and what is there said applies here. (e) Instruction No. 5, given for plaintiffs, is, appellant submits, vicious for many reasons: It leaves to the jury the duty of construing the contract; it leaves to

the jury the question of law as to the legal effect of the contract, when both of these questions were for the court. Carroll v. Campbell, 110 Mo. 557; Miller v. Dunlap, 22 Mo. App. 103; Spalding v. Taylor, 1 Mo. App. 34; Albert v. Bessel, 88 Mo. 150. It leaves to the triers of fact the decision of a wholly equitable question of fraud in the making of the contract. The defense of fraud in making the contract was one solely for the court and not for the jury. The court possibly, upon a proper pleading and a proper case-made, may have found whether or not the contract was fraudulent, or procured by fraud. And so finding, he should have stated to the jury such finding, and not left the matter to them for their finding. Hancock v. Blackwell, 139 Mo. 440; Och v. Railroad, 130 Mo. 27; Homuth v. Railroad, 129 Mo. 629; Courtney v. Blackwell, 150 Mo. 245. (6) Instruction four, refused by the court, should have been given. There was present more than an inference that the sole cause of plaintiffs' ceasing operations came from pressure exerted by their many creditors, and this action is a happy afterthought, entered into for speculative purposes by them. At least defendant was entitled to have the matter go to the jury. Standfield v. Loan Assn., 53 Mo. App. 595; Cahn v. Reid, 18 Mo. App. 115.

*Ward & Collins* and *W. S. C. Walker* for respondents.

(1) Respondents had the right to recover the full value of the carload of handles not shipped. Mugan v. Regan, Super Wells & Co., 48 Mo. App. 463; Lumber Co. v. Warner, 93 Mo. 374; Bean v. Miller, 69 Mo. 384. (2) Respondents had the right to recover damages for profits they would have made if they had continued manufacturing up to July 1, 1905. Lumber Co. v. Warner, 93 Mo. 374; Mfg. Co. v. Railroad, 29 Mo. App. 526; Wiggins F. Co. v. Railroad, 73 Mo. 389; Samuel Peltz v. Augustus Eichele, 62 Mo. 171; Chapman v. Railroad, 146 Mo. 481; Hansard v. Clothing Co., 73 Mo. App.

584; Miller v. Shoe Co., 26 Mo. App. 57; 7 Am. and Eng. Ency. of Law (2 Ed.), p. 150. (3) The failure of appellant to accept and pay for the carload of handles which was the basis of recovery under the first count of the petition was sufficient justification for respondents to permit the mill to lie idle or to cease manufacturing. Lumber Co. v. Warner, 93 Mo. 389; Bertold v. St. L. E. Con. Co., 165 Mo. 305; Chapman v. Railroad, 146 Mo. 494; Gabriel v. Brick Co., 57 Mo. App. 526.

GOODE, J.—Petition in two counts for damages for refusal to perform a contract. Defendant is a corporation now known as the National Handle Company, but formerly as the American Handle Company, under which title, on April 20, 1904, it entered into the following contract with plaintiffs, who were partners:

"Articles of Agreement, made and entered into this 20th day of April, 1904, by and between J. P. Laswell & Co., of Manila, Ark., of the first part, and the American Handle Company, of Cleveland, Ohio, of the second part, represented by ————.

"Witnesseth: That the party of the first part agrees to sell their entire output of handles made at their mill from date until July 1, 1905.

"Handles to be as near as possible to the requirements of the second party, and such as are named in their schedule, which is hereby attached and forms a part of this agreement.

"The second party agrees to buy said first party's handles for the time as stated above and will pay:

"15 per cent advance for XX; 10 per cent advance for X and No. 1's, f. o. b. cars at Manila, 15c per 100 pounds freight allowed. Inspection to be made at first party's mill. Terms cash.

"J. P. Laswell & Co.,
"By J. P. Laswell.
"American Handle Co.,
"G. B. Durell, Treas."

Said contract had attached as part of it a schedule of the varieties and sizes of handles to be taken by the American Handle Company under it. The contract was executed in duplicate and the schedule attached to the copy retained by defendant showed at the trial the species of handles known as "D-stem" had been entirely erased, whereas the schedule attached to the copy retained by plaintiffs showed defendant was to accept from plaintiffs D-stem handles of certain kinds, but the printed provision for D-stem handles of other kinds had been struck out. Plaintiffs, who lived at Campbell, Missouri, moved to and established a mill at Manila, Arkansas, at a cost of five thousand dollars, to manufacture handles and supply them to defendant pursuant to said contract, entered into an agreement with the owners of eight sections of land covered with ash timber suitable for handles, to buy the timber, and in other ways prepared to perform their contract. The arrangement between the parties required the handles manufactured by plaintiffs to be inspected by an inspector furnished by defendant, before defendant was bound to accept the output of plaintiffs' factory, and the course of action followed in performing the contract was for defendant to inform plaintiffs where to ship the handles after they had been manufactured; whereupon it became plaintiffs' duty to get suitable cars from the railway company, load the handles at their expense and forward them according to defendant's directions. Defendant knew plaintiffs could not procure cars until they were able to notify the railway company what destination they were desired for, and this they could not tell until defendant advised them. Defendant company dealt in handles, its main place of business being at Fort Wayne, Indiana, though its correspondence was written from Cleveland, Ohio. From August to October, 1904, plaintiffs manufactured, sold and delivered to defendant seven carloads of handles of varieties mentioned in the schedule, but another car-

load, which was composed of 37,000 handles, of which 22,000 were D-stems, was not taken by defendant. These D-stem handles are a kind used for spades, shovels and garden forks, and are so called because the part of the handle grasped by the hand of the person who is using an implement to which such handle is attached, is in the shape of a "D," the straight part being held in the hand, while a stem of varying length, twenty-four to thirty-two inches, extends from the rounded part of the D to the iron socket in which the handle is fastened. Plaintiffs manufactured only the straight part or stem of the handle, the D part being attached by defendant. As these handles were short, they were made of pieces of timber left after longer varieties had been made. This carload of 37,000 handles seems to have been ready for delivery as early as August, 1904, but though defendant was notified of the fact and had the handles inspected, it did not notify plaintiffs where they were to be shipped, and instead a correspondence ensued which shows procrastination and evasion by defendant, and the handles have not yet been accepted or paid for. It will be observed defendant's letters said nothing of these handles being different from the varieties called for in the contract, as it claimed later by way of excuse for not taking them. The correspondence, which is important, as it shows the spirit of the parties about carrying out the contract and also that defendant knew plaintiffs needed prompt payment for their output in order to run their plant, will be abridged. The first letter relevant to any point involved in the appeal was written by plaintiffs June 14, 1904, and asked defendant to send an inspector at once to take up two carloads of handles and for advice where to ship. The letter said:

"If you will let us know what kind of cars you will want to ship in, we will order them in so as not to delay the shipment; our reason for wanting to get these two

carloads out soon is, that we have been much longer getting them made than we expected, and our plant cost us more than we figured, and we are short of money to pay for timber."

On June 17, 1904, defendant, by its manager, George B. Durell, answered saying an inspector would be sent as soon as possible; that the only man available for the purpose was at South Campbell, Missouri, and he would be written to go to Manila as soon as possible. On June 20th plaintiffs wrote defendant of information they had received which looked like the arrival of the inspector would be delayed and saying: "If we would have to wait for the inspector until he finishes at Campbell, we will be compelled to shut down for the want of room and funds. If you could have the inspector leave the Campbell handles and take up our two loads, or make us an advancement of about fifty per cent, say eight hundred dollars, on the two cars, this will enable us to build more room and go ahead with the work. . . . Do the best for us you can; we do not want to shut down if possible to prevent it. We are getting some fine timber now. We note what you say in regard to getting all the 6-ft. hay fork handles we can, and will be governed accordingly." On July 2, 1904, plaintiffs again wrote defendant saying no answer had been received to plaintiffs' letter of June 20th; that they had ready for shipment three carloads of handles and defendant would greatly oblige by sending a check for $500 as an advance on these cars, as nothing had been heard from the inspector. Durell answered on July 11, 1904, saying defendant's inspector at Campbell had been ordered to stop work there and go to Manila, Arkansas, to take up what handles plaintiffs had on hand; that defendant could not allow plaintiffs to draw in advance of handles being taken up. On August 5, 1904, plaintiffs wrote they had 15,600 hay fork handles loaded in a car and ready to ship; also 20,000 handles of different lengths which

had been inspected; that they could furnish a car by the first of next week, and would like the inspector to load them out before he left Manila, as this would put plaintiffs "in good shape until the next inspection;" that plaintiffs had not received check for the last car·load and defendant would please send it at once. On August 11, 1904, plaintiffs wrote: "We are very much inconvenienced by not receiving check for car 11277 shipped July 25th, and cannot understand why we have not received remittance before now. We would be pleased to hear from you regarding this car; also car 14382, shipped Aug. 8th. We have got a carload handles here inspected and tied up; also have one carload of 5-ft., 5½ & 6-ft Hays made. We are getting in logs for winter run and need money very badly." On August 13th, 1904, defendant telegraphed plaintiffs it had sent check for $750 on August 11th, and asked plaintiffs to send a list of handles which had been "inspected and tied up." In answer to the telegram plaintiffs wrote on August 13, 1904, they had not ·received the check and were very sorry it did not arrive by pay day; that they were getting in timber beyond their daily capacity, needed the money to keep them going and asked remittance on receipt of the letter of all that was due; also whether defendant would pay for 26,000 handles tied up at Manila which had been inspected, or whether plaintiffs would have to wait until they were shipped. On August 15, 1904, plaintiffs wrote defendant giving a list of handles on hand which had been "inspected and tied up;" saying they had, too, a carload which had not been inspected, consisting of hay fork handles, about 9000 D-stems and some other varieties. The letter said it would be a special ac·commodation if defendant would advance $500 on the. handles that had been "inspected and tied up," and send an inspector so all the handles plaintiffs had made could be shipped. On August 27, 1904, plaintiffs wrote, allowing a deduction for an alleged small short-

age in a certain car of handles, and inclosing a bill for
$949.20, less fifteen per cent for freight charges, which
was due them for handles already shipped. The letter
said plaintiffs had been very much inconvenienced by
defendant's holding the remittance back; also, "you
are well aware of our financial condition; we will again
ask you to mail us a remittance at once; also wire us
on receipt of this that you have done so. You have
here tied up and inspected by Mr. Woolworth, 26,875
handles, amounting to $715.45; we would like for you
to make us an advancement on these handles of five
hundred dollars. We also want you to send an in-
spector at once to take up three carloads of handles.
. . . We have had no answer to our last letters written
you in regard to a remittance." On September 30,
1904, plaintiffs wrote, sending a list of handles on hand
which had been "inspected and tied up" and a list of
others ready for inspection. This letter said: "We
hope to get shipping instructions for the above handles
at once; *we need the money to pay for timber already
contracted for our winter's run and we have to pay for
this timber before cutting it.* The timber is good and
the bores are fine now and we hope to be able, by get-
ting pay promptly for the handles we have made now, to
lay in our winter's supply of logs; but we will be unable
to do very much until we get the returns for the above
handles. . . . *Mr. Woolworth is working on D-stems
today; will probably finish them tomorrow."* No further
letters appear in the record from October 17, 1904,
until December 27th, following, when defendant wrote
plaintiffs, acknowledging receipt of a letter written by
the latter on December 23, 1904, and saying defendant
had searched through papers but could not find a mem-
orandum of handles which plaintiffs referred to; for
plaintiffs to forward a memorandum at once and on re-
ceipt of it defendant would "give a definite answer."
This letter will be intelligible if it is remembered plain-
tiffs testified they had informed defendant early in

October, 1904, they had on hand and inspected and ready for shipment, the carload of 37,000 handles, mostly D-stems, but could get no advice from defendant where to ship or an answer to their letters on the subject. Defendant's letter of December 27, 1904, refers to that matter and evidently was written in response to one received from plaintiffs. On January 20, 1905, plaintiffs again wrote saying they were anxiously awaiting a reply in regard to shipping handles; that they wanted to make handles for defendant through the year 1905, as they had arrangements for timber, and if they could get the capital they had written to defendant about, would be able to do considerable business. No reply was received to that letter, but on April 10, 1905, Laswell met Durell by appointment at Blythesville, Indiana, and a conference occurred between the two. After October 27, 1904, as defendant contends, or December 27th, as plaintiffs contend, the latter had ceased to operate the mill and had taken their families back to Campbell, Missouri, for the sake of health, but with the intention on the part of plaintiffs, they testified, to resume operation of the plant when they could get pay for the handles already on hand and felt assured their output would be taken by defendant. The amount due for the inspected handles was about six hundred dollars and plaintiffs said they could not operate their factory until this money was paid, because they could not pay for timber; that not receiving payment for said handles forced them to relinquish contracts for timber and other material, and, moreover, they could not do business if uncertain about defendant taking their product according to the contract; that they had very little capital to begin business on, had gone in debt for machinery and had consumed the profits up to October, 1904, in paying same; that without the money for the handles ready for delivery, they were wholly unable to continue business, and so defendant had been advised. The conference

at Blythesville between Laswell and Durell was with reference to the handles plaintiffs had manufactured, but defendant had not accepted, so Laswell said; whereas the testimony of Durell goes to show the purpose of defendant was to induce plaintiffs to resume the operation of their mill under a new contract. Laswell testified Durell had once said he would take the handles in question, had made arrangements for a lot in Memphis and as soon as a building was erected would take them; then said there was a building on the lot already, and if he could rent it, would take them as soon as the St. Louis & San Francisco Railroad Company built a track to it. Laswell testified further:

"I said to Mr. Durell, 'If you rent this house, why can't we ship the handles and have them carted over; not wait for the railroad to build these tracks, because I have had some experience with railroads putting in sidings, and it is very slow sometimes,' and I said, 'can't we have them drayed over to this house instead of waiting for the tracks to be put in;' he said, 'certainly, we can do that if I can rent the building,' and he said, 'we will take these handles not later than sixty days anyhow; we can have everything arranged, and if I can rent the house, I will take them sooner;' so that suited me exactly.

"Q. What did he say about paying for them? A. Well, it was understood he was to pay for them when they were loaded on the cars. That was their contract and not until, and we couldn't load them until we found out where to load them to; that is where they had us.

"Q. Is that all of the conversation you had with him at that time? A. I think we talked something about making handles for him again; I am not sure; it seems like we did."

Laswell said plaintiffs waited two or three weeks after that agreement, to hear from defendant, and then wrote a letter or two asking why the handles had not

been taken as agreed at the conference. No reply was received until September 29, 1905. Durell testified Laswell met him at Blythesville by appointment in regard to plaintiffs' contention defendant was to take the carload of handles; said defendant called the D-stems "junk" and there was very little sale or use for them; that Laswell wanted to know what defendant would do for him in regard to them and they talked the matter over a good deal, a good many propositions being made back and forth; finally they agreed defendant would take the lot as soon as it could get a warehouse to store it in; that Durell told Laswell defendant had handles piled out of doors, and the same condition prevailed in other places; there was a good demand for them, but defendant was short of warehouse room and just as soon as it could get a warehouse it would take the handles. Further:

"At the time I entered into the agreement with him that he would start up his mill, he said—he admitted his trouble had been that he hadn't had sufficient capital to run it, but he had hope of getting other capital and if we would give him a contract he would be able to start up his mill and make handles for us again; and I told him if he would do that, that we would write up a contract a little differently in which the sizes and specifications would be more clearly expressed than in the first one; the first contract was perfectly clear to a man that understands the handle business; Mr. Laswell hadn't had any experience in the handle business and therefore he got into trouble; so in the second one I drew up I drew it up so there would be no trouble on that score.

"Q. You drew up the contract which has been offered in evidence here by the plaintiffs and the one which I now show you dated the 28th of October, 1905? A. Yes, sir; I dictated that."

Durell excused defendant for not taking the carload of handles, mostly D-stems, after the conference

on the ground that the Frisco Railroad Company had refused to build a side track to defendant's storage room in Memphis; said further regarding defendant's conduct, that it did the very best it could; its business was a peculiar one; it had dealings with more than a hundred manufacturers over the country and but few inspectors, whom it distributed to the factories as promptly as possible. He said in regard to the contract of October 28, 1905, that he wanted to make it so clear there would be no question about it and put in everything he could think of regarding the length of handles wanted. Laswell testified further as follows regarding the second contract:

"Q. Now you have already referred to and identified a second contract that you made with the defendant company here about October 28, 1905, signed and mailed to them about November 5, 1905; you may tell the jury if at the time you entered into that contract the condition as expressed by you and understood by you was that he should pay you this $616 as a condition precedent to making the contract? A. Well, I can tell the jury how we came to make the second contract; after I met Mr. Durell at Blythesville, and he promised to take the handles and didn't do it, and then we wrote him to know why he didn't do it, and then he wrote back to us and sent us this contract and wrote in the letter that if we would send the contract. . . . If we would sign the contract for another year, he would give us shipping instructions for these handles.

"Court: The question is how you came to make the second contract? A. We had our plant down there standing still; was ready to run; all we needed was this six hundred dollars to start with and we thought we could make some money; and we could I think, but we didn't have the money to start with . . . We wanted to run a plant and he sent us a contract and he sent us shipping instructions for the handles (N. B. Evi-

147 App—33

dently means Durell wrote he would send instructions) and we sent the contract; we knew if we got the money we could run and that was the last; we never got to ship the handles; we wanted to run; we wanted to make handles; were anxious to.

"Q. Then was it or not that you expected to get pay for these handles from him that you signed this contract? A. Why certainly, my letter there shows that, that we sent back with the contract.

"Q. Now, Mr. Laswell, after signing this second contract did he ever pay you this money you had been worried about and you had been thinking about? A. He never did pay us a cent of money."

Taking up now the correspondence between the parties after April 10, 1905, the first letter we find was dated July 11, 1905, and said plaintiffs had everything ready to start up and then was the best time to get timber; that they would appreciate it very much if defendant would take the handles on hand and give orders for more cars, so plaintiffs could start; that if defendant would take the handles on hand and pay for them, plaintiffs would then have sufficient means to run until they could get out two or three cars; for defendant to answer at once as plaintiffs wanted to be doing something; that Durell had promised he would take the handles which had been inspected, *"just as soon as he could find room to store them."* The first letter from defendant was written September 29, 1905, and reads thus: "It has taken much longer than we anticipated to get facilities for storing handles in Memphis. We have now the building ready for use, but the side track is not yet fully completed. We hope, however, to have same completed in a few weeks. When I last saw you, you stated that you would like to make handles again for us this fall. Please advise us how this will be." On October 28, 1905, Durell inclosed duplicates of the contract of that date with the following letter: "I did not get home as early as I anticipated.

I herewith enclose a contract in duplicate. If this is satisfactory to you, please sign both copies, retaining one for your files, and returning the other to us. *Upon receipt of same we will give you shipping instructions for the handles about which we have been corresponding,* though a considerable part of this is dead stock for which we have no use." The contract inclosed was this one:

"Articles of Agreement, made and entered into this 28th day of October, 1905, by and between J. P. Laswell & Co. of Manila, Arkansas, party of the first part, and the National Handle Company of Cleveland, Ohio, party of the second part.

"Witnesseth: that the party of the first part agrees to start up and operate its handle factory at Manila, Arkansas, for the purpose of manufacturing long ash handles for the party of the second part, and to continue the same in operation to July 1, 1906, weather conditions permitting.

"All handles to be manufactured as nearly as possible according to the specifications to be furnished by the second party, and to be of the following sizes and grades: 6′, 5½′, 5′ and 4½′ hay fork, in three grades; 4½′ manure, 6½′ standard pattern rake, 5½′ and 5′ black land hoe in three grades, and 4′, 3¾′ and 3½′ hay in XX grade and 4′ manure fork in XX and X grade; and to be manufactured in accordance with the schedule of sizes in the standard handles schedule No. 3 of the second party, which is hereto attached and made a part of this agreement.

"Party of the first part agrees to sell the handles so manufactured to the party of the second part, and the party of the second part agrees to buy all of the same at the list price plus 10% as they appear upon said standard handles schedule No. 3, f. o. b. cars, Manila, Arkansas, full freight allowed on shipments to Memphis, Tennessee, and on shipments to other points,

a freight allowance to be made equal to the freight from Manila, Arkansas, to Memphis, Tennessee.

"It is estimated that all the handles that will be manufactured by the first party during the period of this contract will be from 600,000 to 1,000,000.

"Said handles are bought and sold upon the grading and inspection of the second party, at the plant of the party of the first part, in Manila, Arkansas.

"Terms cash.            NATIONAL HANDLE CO.,

"J. P. LASWELL & Co., By C. B. DURELL, Treas.

"By J. P. LASWELL."

Plaintiffs signed both copies of said contract, retained one and returned the other to defendant with the following letter of November 5, 1905: "In answer to your letter of the 28th ult. we inclose contract signed. *Please give us shipping directions for the handles now on hand, as we cannot start up until we get pay for them.* Trusting you will give this matter your immediate attention, as we are anxious to get started." After the execution of the contract defendant furnished no specifications for handles, made no request for them and did nothing else toward performing or demanding performance, except writing certain letters to be shown infra. On November 14, 1905, defendant wrote acknowledging receipt of the contract of October 28, 1905, duly signed by plaintiffs, and asking plaintiffs to procure and send defendant the best freight rate to Fort Wayne, Indiana, on handles plaintiffs had on hand. On November 20, 1905, plaintiffs wrote to defendant, advising it the rate from Memphis to Blythesville, was four cents per hundredweight, and saying defendant had the rate from Blythesville to Fort Wayne. Blythesville was but a short distance from Fort Wayne. Durell testified that on November 24, 1905, he wrote plaintiffs to ship the handles they had on hand to Fort Wayne, but plaintiffs testified positively they never received any such letter and circumstances corroborate

them. On January 3, 1906, plaintiffs wrote defendant the following letter:

"As we have not had any reply to any of our letters for the last month, we presume you do not intend to comply with your agreement with us, and if so will you kindly write us to that effect and return our contract for handles to be made by us for you this year. We have some prospect now of selling our plant, in fact, we have two prospective sales. We had much rather keep and operate the plant ourselves; but as we have often written you, that unless you pay us for the handles which you have taken up from us at Manila, we are unable to start and run the plant."

The letter stated Durell's promise to take and pay for the handles and said:

"If you have decided not to pay us for these handles, please write us to that effect and we will make claim for them with all the loss we have sustained on your account. If you will send us an advance of five hundred ($500) dollars, we will start up at once and carry out our new contract. Please answer and oblige."

No reply was received to that letter and it ended the correspondence between the parties; but some letters passed between a firm of attorneys representing plaintiffs, and defendant, and on March 13, 1905, Durell, for defendant, wrote said attorneys a long letter, the substance of which was that defendant had entered into the contract of April 20, 1904, with plaintiffs, on their promise to manufacture five thousand handles a day; that the paper was really a memorandum of a contract to be carried out in a fair-minded spirit by both parties, as it did not bind plaintiffs to make a certain quantity per day or defendant to take the handles at any special times; that plaintiffs had insisted on defendant accepting every "little jag of handles" plaintiffs would get out and have an inspector there to take them up, which caused too much expense, and it

was the custom of defendant to send an inspector only when there were several cars of handles ready; that the contract required plaintiffs to make handles as near as possible to the requirements of defendant, which meant plaintiffs were to write and ask what kinds were to be manufactured before making them and this had not been done; that the inspector did not know what the contract was as it was not safe to let him have the information and defendant's inspectors merely passed the handles and then defendant wrote them what should be done with the installments inspected; that if plaintiffs had manufactured at the rate of three thousand a day and had had several carloads accumulated before asking for an inspector, there would have been no trouble in getting defendant to take all the handles turned out, though some of them were not in the schedule attached to the memorandum of contract; that defendant would accept the handles on hand less twenty-five per cent discount from the price named in the contract if plaintiff would enter into an agreement that this was in full settlement and cancellation of the contract of April 20, 1904, and the reason for this proposition was defendant did not want plaintiffs to go ahead and make "little jags of handles" and demand an inspector for them. The attorneys wrote back under date of April 1, 1905, controverting the various statements in Durell's letter, saying the handles on hand had been inspected and the inspector in each instance compared the installment delivered with the contract, and wound up by saying if defendant would pay for the handles on hand, plaintiffs would waive the question of damages and cancel the contract; if not, would sue and recover all they could. No reply to this letter is in the record, but the conference of April 10, 1905, followed it.

Plaintiffs ask damages to the amount of $616 on the first count of their petition, for the direct loss suffered by them in consequence of defendant's refusal to pay for the carload of 37,000 handles. In the second count

they ask for compensation for loss of profits which would have been earned if the contract had been carried out in full, and plaintiffs had manufactured and defendant had accepted and paid for the whole number of handles called for in the original contract of April 20, 1904, ascribing this loss to the same breach declared on in the first count, namely, defendant's refusal to accept and pay for the last carload of handles, which action of defendant, forced plaintiffs, it is alleged, to close their factory and suspend business, surrender contracts for the purchase of a large quantity of valuable handle timber they had contracted for at a fair price and from which they would have made a profit; alleges if said contract had been carried out, they would have earned thirty dollars net profit per day from the manufacturing of three thousand handles, the daily output of their factory, and in performing the whole contract would have earned a total of $4500, for which sum they prayed judgment. The answer admitted the execution of the contract declared on in the petition, denied the other averments and alleged further defendant complied in all respects with its part of said contract, took and paid for all handles manufactured and delivered free on board cars by plaintiffs of the kinds and grades mentioned in the schedule attached to the contract. In answer to the second count of the petition, defendant denied its averments and set up a counterclaim for breach by plaintiffs of the contract of October 28, 1905, copied supra. Plaintiffs replied to the counterclaim with averments to be stated infra. The jury found for plaintiffs on both counts of the petition, assessing their damages at $555.34 on the first, and on the second count at $2500; they also found the issues for plaintiffs on the counterclaim.

I.   The first count of the petition asked judgment for $616.30, the value of the 37,000 handles defendant failed and refused to take. Though defendant insisted

before this action was brought those handles were, in the main, of a kind the contract did not require it to take, and renewed this contention in its answer, it was conceded on the argument of the appeal the D-stem handles were embraced in the schedule attached to the first contract, hence were as much a part of said contract as any other variety and defendant was as much bound to take them. The defense insisted on to the first count is that defendant was not bound to take the handles unless they were loaded on cars, because the contract required plaintiffs to load them free on board cars, or at plaintiffs' expense, which never was done, or even alleged in the petition to have been done; wherefore it followed plaintiffs neither stated nor established a cause of action as regards the subject-matter of the first count. What had already been done under the contract and the correspondence between the parties and the testimony for both sides show it was understood the proper method to follow was for plaintiffs not to load until they were advised where to ship. Under date of October 28, 1905, Durell wrote plaintiffs if they would sign the contracts inclosed, shipping directions regarding the handles they had on hand would be sent, and, indeed, he testified to writing, stamping and mailing, on November 24, 1905, a direction to ship those handles to Fort Wayne. In view of the course of business and the understanding between the parties with reference to this matter, we hold if defendant omitted to instruct plaintiffs where to ship, it was not expected plaintiffs would load the handles, and omitting to load does not defeat recovery by plaintiffs. On the contrary, if defendant sent advice where to ship, as Durell testified, and plaintiffs received the letter, which they denied, then they failed to perform. If the letter was sent but not received and plaintiffs a little more than a month afterwards, on January 6, 1906, again wrote for advice, and defendant received the letter it is in default and not plaintiffs. The posi-

tions taken by the parties on this defense were placed before the jury in sound instructions and the right of the matter was settled by the verdict. The court instructed that if the handles mentioned in the first count were in accordance with the schedule attached to the contract, had been inspected and plaintiffs could not load them on cars until a shipping direction was given by defendant, and it never gave this direction nor accepted the handles, the issues on the first count should be found for plaintiffs. Further, that though the contract required plaintiffs to deliver the handles f. o. b. cars at Manila, Arkansas, if the jury believed from the evidence plaintiffs could not load them until defendant gave a shipping direction, or by the established course of business under the contract, the handles were not to be loaded on cars except on receipt of advice where to ship, and this advice never was furnished, then plaintiffs were not required to load in order to recover on the first count of the petition. For defendant the court said if the jury found plaintiffs were advised where to ship, but the handles were not shipped to nor received by defendant, plaintiffs could not recover for them; further, that the contract of April 20, 1904, bound defendant to take only such handles, of the kinds and grades set forth in the schedule attached to the contract as might be made by plaintiffs at their mill and loaded on cars at Manila, and if defendant accepted and paid, or offered to pay for all handles of said kinds and grades, or gave shipping advice for and offered to take all such handles, the finding on the first count should be for defendant. In Kingsland, etc., Co. v. Iron Co., 29 Mo. App. 526, the case was to recover the price of certain castings manufactured and delivered to defendant, but not paid for, and other castings the plaintiff had offered and been ready and willing to deliver to the defendant, but it had refused to receive. As to the latter castings, the defendant contended the plaintiff had made no offer to deliver them, but it ap-

peared advice had been requested from the defendant what to do with them and the latter had refused to give any. The court said as the contract between the parties did not specify where or when the castings should be delivered, it was the plaintiff's duty to notify the defendant it was ready to deliver and ask that a place of delivery be designated. The defense is specious that the defendant at bar would have taken and paid for these handles had they been loaded on cars, for it never took this position in correspondence or conference about the matter, but evaded taking any position and later declared it was not bound to accept the handles because they were of a kind not mentioned in the schedule attached to the contract. In this view of the matter the case just cited is also in point; for touching the like contention, the opinion said, in effect, a tender was unnecessary where the person to whom it should have been made had showed he would refuse it if made (l. c. 538). The verdict on the first count was rendered under sound instructions and may stand.

II. In the second count of the petition plaintiffs prayed damages for the profit they would have made if the contract of April 20, 1904, had been carried out in full to the date of expiration, July 1, 1905, alleging defendant refused to perform its obligation subsequent to December 27, 1904, or to accept and pay for handles afterwards manufactured, though often requested to do so, and thereby forced a suspension of the business and the closing of the factory. The substance of the breach alleged in the count is the refusal of defendant to direct where to ship or accept and pay for 37,000 handles of the value of $616.30, which plaintiff had ready for delivery in October, 1904. This default is charged to have forced plaintiffs to suspend business, it being alleged that otherwise and if the contract had been carried out by defendant, they would have manufac- tured 3000 handles a day at a net profit of ten dollars

a thousand, and their total profits from December 27, 1904 to the expiration of the contract on July 1, 1905, would have been $4500. For plaintiffs the court instructed, in substance, that if the jury believed they complied with the contract, but defendant failed to accept and pay for the handles manufactured and thereby plaintiffs were forced to stop manufacturing and let their factory remain idle from December 27, 1904, to July 1, 1905, and were damaged, the verdict should be for them on the second count in a sum not to exceed $4500; that the measure of damages on said count was the net profit plaintiffs would have made under the contract between the dates mentioned. As defendant contended plaintiffs closed their factory in October, 1904, because of lack of means wherewith to operate it, and not on account of defendant's default, the court instructed at the latter's instance, that neither of the contracts in evidence required defendant to pay plaintiffs money in advance on handles to be manufactured thereafter, and though defendant refused to make advance payments, this was no breach of the contract or ground for awarding damages to plaintiffs; that unless the jury found defendant committed "a breach of the contract sufficient to be the proximate cause of stopping plaintiffs' mill in October, 1904," the verdict and finding should be for defendant on the second count of the petition. An instruction was refused of this tenor: If the jury believed plaintiffs shut down their mill in October, 1904, because they were in debt to various firms and unable to pay their creditors, the verdict and finding should be for defendant on the second count.

These contentions are put forward by defendant against the verdict on the second count: First, the evidence shows beyond inference to the contrary plaintiffs ceased to make and tender handles, in other words to perform their undertaking, because of lack of capital and not from any breach of contract by defendant; second, defendant did not breach the contract at all, or,

at least, to an extent that would permit plaintiffs to cease tendering handles and recover profits on the whole contract; third, the court erred in its rulings on the requests for instructions relating to the second cause of action. No doubt both Laswell and Post, the two plaintiffs, gave testimony from which the jury might have concluded they abandoned work solely in consequence of their funds being exhausted; further that they would have been able to continue had defendant promptly paid for the carload of handles containing D-stems; that they were unable to do so without such payment, and hence not receiving it forced them "to stop manufacturing handles and . . . to let their factory remain idle from the 27th day of December, 1904, until the expiration of the contract . . . on July 1, 1905," as an instruction for plaintiffs reads. But the evidence was not so uniform in favor of those conclusions as to exclude any other. From the testimony of the plaintiffs might be drawn these inferences: Though in debt, they could and would have borrowed money for operating expenses and the purchase of timber, could have procured indulgence from their employees in the payment of wages and thus have continued to operate the factory and furnish handles to defendant; but the latter's behavior induced plaintiffs. to believe it would take no more deliveries, especially no D-stems; wherefore plaintiffs were deterred from manufacturing, and finally, after futile efforts down to December 27th to get defendant to accept the D-stems, were caused to cease offering to manufacture. The testimony of plaintiffs as a whole is, they would have been helped by and expected payment for the untaken carload and were embarrassed by not receiving it; but their reason for ceasing work October 20th, was defendant would give no shipping direction for the carload after it had passed inspection with four other carloads, the latter being accepted and paid for at once. Plaintiffs endeavored from the latter part of

September or the first of October, when the inspection occurred, and the other cars were accepted, until December 27th, to obtain a shipping direction for this car; and though they were so far daunted by defendant's conduct as to cease turning out handles on October 20th, they seem not to have lost hope or to have stopped offering to go on with the contract, until the former date. Therefore we reject the argument that no inference could be drawn regarding cessation of performance by plaintiffs except that it was in consequence of want of capital and of defendant's failure to pay for the car containing D-stem handles. We hold it could be found the cessation was due to the refusal of said handles and the well-founded belief of plaintiffs that no D-stems would be accepted, rather than to inability to operate for lack of means or of the price of the rejected carload. We hold further, the jury might find from defendant's conduct it had refused to accept and pay for said carload. The contract did not say when handles turned out by plaintiffs should be inspected, and, if found up to requirements, paid for; and in the absence of a stipulation regulating this matter, both parties were bound to rest content with reasonable conduct. The course of business followed through several months showed both understood defendant should have the output of the factory inspected at intervals, and promptly thereafter give shipping directions and pay for such handles as passed inspection. Taking the four cars inspected along with the D-stems and not taking them at the same time or for some two or three months afterwards, were facts conducing to show they were refused. If so refused, defendant breached the contract; for it is conceded D-stems were mentioned in the schedule as a kind defendant agreed to take. This brings us to the question, and it has been difficult to answer, whether the breach was of a character to permit plaintiffs to cease performance of the contract and recover the profits they would have earned

had it been carried out; or whether, if they would recover such profits, it was essential for them to offer further performance. We have been embarrassed by the uncertainty of the record about how long the rejected handles had been on hand and ready for inspection and when they were inspected. The correspondence reads like plaintiffs complained through August and September of needing an inspector for them, and looks, too, like they must have been passed prior to September 30, 1904; for then plaintiffs wrote defendant they had been inspected and "tied up." It is certain they were passed some time in September and later, about the last of said month, four other carloads were taken and they were not. It is certain also plaintiffs urgently but vainly requested a shipping direction for them through three months. The evidence goes to prove defendant's behavior was artful, disingenuous and pursuant to a purpose to evade taking any D-stem handles and possibly any handles plaintiff might manufacture. It delayed answers to plaintiffs' appeals; gave inconsistent reasons for its conduct, asserted sometimes the rejected handles were of a kind not covered by the contract, at others that plaintiffs wanted too many inspections; that there was no demand for D-stem handles in the market, defendant's storage room was overrun, that it had written a shipping direction which likely never was written, and, finally, when threatened with an action for damages by plaintiffs' attorney in March, 1905, defendant had its manager Durell meet Laswell at Blythesville, Indiana, agreed there to take the rejected handles inside of sixty days, evaded this agreement on the pretext of lack of storage room and shipping facilities, more than six months later sent plaintiffs duplicate contracts to be executed which Durell said were agreed upon at the April conference, promised if they were executed to accept the handles on hand, failed thereafter to accept them and never called for any handles under the new contract. The

inference may be drawn from such behavior that defendant desired to escape taking more of plaintiffs' output, either because the demand for handles was dull, or because no storage room was available, or, as Durell wrote plaintiffs' attorneys, because it was too expensive and troublesome to comply with plaintiffs' requests. In the letter written to the attorneys, and admitted in evidence without objection, defendant asked the cancellation of the first contract. We will presume defendant intended to accept from plaintiffs all the handles their mill would turn out, other than D-stems, but it is reasonably plain the latter kind were not desired and would be refused if tendered. Durell finally took the position those handles were not mentioned in the schedule attached to the contract and defendant was under no obligation to take them. As said supra, it was conceded on the appeal they were one of the varieties called for in the schedule. Moreover, they were manufactured from parts of timber left after long handles had been made, and in order for plaintiffs to work up their timber advantageously and realize in full measure the profits of their contract, they were bound to manufacture D-stem handles.

Plaintiffs cannot recover unearned profits unless defendant's conduct sufficed, in contemplation of law, to prevent them from further performance; if it did, they can. [Pond v. Wyman, 15 Mo. 175; McCullough v. Baker, 47 Mo. 201; Murphy v. Block, 78 Mo. App. 316; Chapman v. Railroad, 48 S. W. 646.] A party may be prevented in several ways from keeping a contractual obligation and yet remain entitled to the full benefit he would have derived from keeping it; as if the other party renders it impossible for him to keep it. [Jarrett v. Farris, 6 Mo. 159; Seaman v. Paddock, 55 Mo. App. 96.] Or directs him to desist from performance, as happened in the cases cited for plaintiffs. [Black River Lumber Co. v. Warner, 93 Mo. 374, 6 S. W. 210; Chapman v. Railroad, 146 Mo. supra; Ber-

thold v. Const. Co., 165 Mo. 305, 65 S. W. 784.] Or fails
to keep a condition precedent. [Monks v. Miller, 13
Mo. App. 363; Craycroft v. Walker, 26 Mo. App. 469;
Filley v. Pope, 115 U. S. 213.] Or expressly
renounces the contract. [Claes, etc., Co. v. McCord, 65
Mo. App. 507.] Or abandons it. [Henry v. Bassett,
75 Mo. 89.] Or breaches covenants of such importance
the breach is equivalent to renunciation. [Freeth v.
Burr, 9 C. B. 208; Graver v. Scott, 80 Pa. St. 88;
Koerper v. Inv. Co., 102 Mo. App. 543.] The last mode
of preventing performance is the only one that possi-
bly may be applicable to this controversy; and we pre-
mise the discussion of whether it is applicable, by re-
marking we are dealing with a case wherein the ques-
tion is not what breach of an agreement by one party
will discharge the other, or entitle him to rescind, or
recover for what he has already done, but what breach
suffices to entitle the innocent party to cease perform-
ance and, after the contract has expired, recover un-
earned profits. The old cases and perhaps some modern
ones, appear to say no breach will do this unless it
deprives the innocent party of the total consideration
for which he entered into the agreement; that for less
harmful results redress must be sought in damages on
the broken covenant, and the aggrieved party may not
rescind, or if he may, he will not be allowed to recover
except for what he has done. On the contrary, eminent
courts have held it is enough if the contract is broken
in a way to show the culprit repudiates a substantial
part of his obligation, and the repudiation will leave
the objects and consideration which induced the other
party to make the agreement, unattainable. [Boone v.
Eyre, 1 H. Bl. 273; Phillips v. Bruce, Anthon. N. P.
89; Keenan v. Brown, 21 Vt. 86.] Perhaps the preva-
lent rule is that mere failure to pay money when due
will not warrant him to whom it is due to no longer
keep his engagement and permit a recovery as though
he had. [Palm v. Railroad, 18 Ill. 223.] Stipulations

in commercial transactions are most apt to be treated as dependent and indivisible, on the theory that this course conforms to the intention of business men, who are accustomed to depend on prompt compliance with engagements and may be ruined by tolerating breaches. That reason is pertinent to the case in hand, since plaintiffs went in debt for their mill, machinery and timber solely on the faith of their engagement with defendant, and expecting to meet their liabilities with the money to be collected on installments of handles.    However they failed to insist on a proviso that carloads should be inspected and taken at stated intervals or to make those acts conditions precedent to further deliveries.    Therefore we hold the failure to take and accept promptly a single carload, did not, of itself, excuse plaintiffs from going ahead and yet enable them to recover future profits. In Norrington v. Wright, 115 U. S. 188, the plaintiffs in London had agreed to sell the defendants in Philadelphia five thousand tons of iron rails to be shipped ''at the rate of about one thousand tons per month.''  During the three months following, the shipments were four hundred tons in February, 885 tons in March and 1571 tons in April.  As soon as the defendants learned of these deviations from the contract, they gave notice of rescission, but the plaintiffs continued to tender deliveries and afterwards sued for the total price.    The defendants were held justified in rescinding because of the departure from the stipulated terms, it being ruled the expression ''about 1000 tons a month,'' was of the essence of the agreement and the word ''about'' did not warrant deviations to the extent they occurred. The court examined numerous English and American cases and pointed out their accords and conflicts. In Hoar v. Rennie, 5 H. & N. 19, the like judgment was given; but in Simpson v. Crippins, L. R. A. 2 B. 14, on such a contract deviations in delivery were held not to justify rescission; and so it was ruled in

147 App—34

Brandt v. Lawrence, 1 Q. B. D. 344. In Borres v. Shand, 1 Q. B. D. 70, 2 Q. B. D. 112, 2 App. Cas. 455, it was ruled in conformity to Hoar v. Rennie, a contract to ship three hundred tons of rice at Madras during March and April was breached in a way to justify rescission by shipping in February, though it was shown rice shipped in the latter month would be as good as though shipped in the former. It was said that in these mercantile contracts stipulations were inserted presumably because they appeared important to the parties and the courts were not at liberty to reject them as unimportant. In Henck v. Muller, 7 Q. B. D. 92, under a contract for the sale of two thousand tons of pig iron to be delivered in November and through November, December and January, the buyer refused to take any iron in November, and the seller was justified in cancelling the contract. In Freeth v. Burr, 9 C. P. 208, which is a leading case, the defendant had agreed ·to sell plaintiffs two hundred and fifty tons of pig iron, one-half to be delivered in two and the remainder in four weeks, for net cash in fourteen days after delivery of each parcel. The market was rising and the delivery of the first half of the iron, agreed to be made in two weeks, was not completed for six months. For this reason the plaintiffs refused to pay for it according to the contract, claiming a set-off in consequence of loss they had sustained by the delay in delivery and by being forced to procure iron elsewhere. They still demanded the second half, but the defendant treated the refusal to pay for the first half as an abandonment of the contract and declined to deliver any more. It was held the refusal to pay for the first parcel did not, under the circumstances, warrant the seller in treating the contract as abandoned and plaintiffs were entitled to damages for the breach. It appeared in evidence the buyer had been anxious for the completion of the contract and the correspondence showed it had in-

sisted on compliance, but met only with excuses and resistance from the seller. Those were the circumstances which operated to prevent the buyer's refusal to pay for the first installment from being regarded as an abandonment of the contract, the seller being really the party in fault. It was in that case Lord COLERIDGE's oft quoted observations were made on the subject of what breaches of contract by one party will release another. He said:

"Where the question is whether the one party is set free by the action of the other, the real matter for consideration is whether the acts or conduct of the one do or do not amount to an intimation of an intention to abandon and altogether refuse performance of the contract. I say this in order to explain the ground upon which I think the decision of these cases must rest. There has been some conflict amongst them. But I think it may be taken that the fair result of them is as I have stated, *viz*: that the true question is whether the acts and conduct of the party evince an intention no longer to be bound by the contract. Now non-payment on the one hand, or non-delivery on the other, may amount to such an act, or may be evidence for a jury of an intention wholly to abandon the contract and set the other party free. That is the true principle on which Hoar v. Rennie was decided, whether rightly or not upon the facts, I will not presume to say. Where by the non-delivery of part of the thing contracted for, the whole object of the contract is frustrated, the party making default renounces on his part all the obligations of the contract. . . The principle to be applied in these cases is, whether the non-delivery or the non-payment amounts to an abandonment of the contract or a refusal to perform it on the part of the person so making default. That being so, and my Brother Brett having ruled that the mere non-payment for the first portion of the iron contracted for, unattended by any other act on the part of the purchasers,

did not put an end to the contract so as to disentitle the purchasers to maintain an action for the non-delivery of the second portion, but only gave the seller a remedy by cross-action (of which he has availed himself) I am of opinion that his ruling was correct, and that the rule should be discharged.''

In Mersey Steel & Iron Co. v. Naylor, 9 Q. B. D. 649, 9 App. Cas. 434, the plaintiff had sold to defendant five thousand tons of steel to be delivered one thousand tons monthly and a delivery was made in January and February. Just before payment for these installments was due, the company became insolvent, a petition was presented to wind up its affairs, and defendant, acting on the advice of attorneys and thinking it could not safely pay under the circumstances, declined to do so unless the company obtained the sanction of the court. Thereupon the company gave notice it would consider the default as releasing it from further deliveries. Two things are held in this case: That payment for previous installments was not a condition precedent on the part of the buyer to claim the next one, and that by postponing payment under erroneous advice, respondent had not shown an intention to repudiate the contract so as to relieve the company from further performance. Commenting on the remarks of Lord COLE-RIDGE in Freeth v. Burr, it was said that to determine whether the breach of the contract amounted to abandonment of it to justify the opposite party in ceasing further to perform, "You must look at the actual circumstances of the case in order to see whether the one party to the contract is relieved from future performance of the contract by the conduct of the other; you must examine what that conduct is so as to see whether it amounts to absolute renunciation, an absolute refusal to perform the contract such as would amount to a rescission if he had the power to rescind, and whether the other party may accept it as a reason for not performing his part.'' In Railroad Co. v. Ontario Rolling

Mills, 10 Ont. App. 677, the defendant had bought old rails from the plaintiff to be paid for as each one hundred tons were delivered. One thousand one hundred and fifty tons out of the one thousand three hundred tons bought having been consigned to the defendant, the plaintiff drew for the amount thereof at the agreed price, but the defendant refused to accept the draft under the mistaken belief it had not received a portion of the iron charged for. The court held this refusal was not, under the circumstances, such an act as to warrant the plaintiff to treat it as a repudiation of the contract; the court saying the test of the sufficiency of the breach for that purpose was "not whether the conduct of one party was inconsistent with the contract, *but whether the conduct of one party to the contract was really inconsistent with the intention* to be bound any longer by the contract; that there must necessarily be a question of fact on the evidence in each particular case." The facts were examined by several judges and the conclusion reached they did not show the defendant had refused to pay what it owed, but rather had refused to pay what it considered to be an overdraft. In Ballance v. Vanuxem et al., 191 Ill. 319, 90 Ill. App. 232, it appeared the appellees who were general agents for the New York Life Insurance Company in Illinois, had appointed Ballance a sub-agent over twenty-two counties for a year, unless the contract was terminated meanwhile by mutual consent or a violation of its terms. Before the end of the year controversies arose and Ballance withheld premiums collected by him, also failed to make reports on a number of policies. Thereupon the appellees gave notice the contract was terminated and they would commence suit to recover what Ballance owed them. The action having been instituted, Ballance claimed default in performance by the appellees themselves. The jury found against him and the Supreme Court held there was evidence to show he had breached the contract. The

lower court refused this instruction requested by him and the refusal was assigned for error on the appeal:

"The plaintiffs had no right to abandon or terminate the contract with the defendant because of a default by the latter in the performance of some covenant or covenants, unless the default were of such a nature as to defeat the whole purpose of the contract."

As to the contention that the breach must have been total by Ballance in order to warrant a rescission by the appellees, the Supreme Court reviewed the various prior Illinois decisions and we will quote a part of the opinion, emphasizing a portion of the quotation:

"Appellant's contention is that the failure of Ballance to comply with the contract must have been total to authorize a rescission by the appellees, and in support of the proposition, Selby v. Hutchinson, 4 Gilm. 319, and other cases containing similar language are cited. . . . But in Leopold v. Salkey, 89 Ill. 412, this court said: 'The general remark made by the court (quoting it as above),' (*i. e.*, from Selby v. Hutchinson), 'is not understood as laying down the rule that to justify an abandonment of a contract, the opposite party must have failed to discharge every obligation imposed on him; but simply that matters which do not go to the substance of the contract and failure to perform which would not render the performance of the rest a thing different, in substance, from what was contracted for, do not authorize an abandonment of the contract; *for when the failure to perform the contract in respect to matters which would render the performance of the rest a thing different in substance from what was contracted for, so far as we are advised the authorities all agree the party not in default may abandon the contract.*' See also Lake Shore & Michigan So. R. R. Co. v. Richards, 152 Ill. 59. As applied to the case at bar we are of the opinion the court properly refused to hold as law in the decision of the case

the proposition as presented: that it was not necessary that the appellant's default should be 'of such a nature as to defeat the whole purpose of the contract,' to entitle the appellees to terminate it.''

In Armstrong v. Coal & Iron Co., 48 Minn. 113, a contract had been made by which the defendant had agreed to sell to the plaintiff 10,000 tons of coal at certain prices for two grades, the coal to be received and paid for between June, 1885, and May 1, 1886. Certain modifications of the contract were made in the interim which resulted in a misunderstanding between the parties as to the prices, in consequence of which the plaintiffs refused to receive and pay for the balance of the 10,000 tons to be taken by them under the contract. In the action instituted by the plaintiffs for an alleged breach of the contract by the defendant in refusing to deliver six thousand tons of coal at prices which the plaintiffs alleged had been agreed upon, the defendant filed a counterclaim for the refusal of the plaintiffs to receive said balance at the original prices. It turned out on the facts the plaintiffs were in error about the extent of the reduction of prices made by the subsequent agreement from what they were fixed at by the original agreement; hence they failed in their action and the court instructed for a verdict on the counterclaim. The question on the appeal was the propriety of this direction. The court held that the plaintiffs had repudiated the contract in refusing, through a mistake of fact, to take and pay for the six thousand tons at the original price; hence could not recover from the defendant, but the latter might recover on its counterclaim for the repudiation, saying:

''That where one party to an executory contract repudiates it by refusing to be bound by its terms, the other party may take him at his word, and act upon it by treating the contract at an end, and bring an action for damages for its breach, is, of course, elementary.

The only question is what will constitute a repudiation? The true test, stated generally, is whether the acts and conduct of the party evinced an intention no longer to be bound by the contract, and the fair result of the authorities is that it is not only an absolute refusal in words to perform a contract, but *also any clear manifestation by words or acts of an intention not to perform it according to its terms*, that will authorize the other party to treat this as a repudiation and bring his action. . . . The legal effect of this" (*i. e.*, plaintiffs' refusal to pay for offers of coal at the prices agreed on in the first contract) "was not changed by the fact that it was coupled with a profession that they were ready and willing to perform the contract; for manifestly the 'contract' which they asserted their willingness to perform was not the contract of the parties, but an entirely different one. Neither did it make any difference so far as concerned defendant's right to act on this as a repudiation, that it might not have been willful or fraudulent, but the result of a mistake as to the terms of the contract. In planting themselves on their own construction of it, the plaintiffs took their chances; and as it was in fact incorrect, they must stand the legal consequences of their acts. It is doubtless true that there may be acts of default in the performance of the strict terms of a contract which would not evince any intention to repudiate its obligations, and which consequently the other party would have no right to treat as a repudiation. An example of this is Mersey Steel & Iron Co. v. Naylor, 9 App. Cas. 434, cited and relied on by plaintiffs. But this is clearly not such a case." (Italics ours.)

In Graves v. Scott, 80 Pa. St. 88, it was said if the part of a contract of sale that has failed is so essential to the residue that it cannot be supposed in reason the purchase would have been made without it, the contract is dissolved *in toto*. See, too, Boulware v. Crohn, 122 Mo. App. 571, 582. The most instructive opinion we

have found wherein this subject is treated is Lake
Shore, etc., R. R. Co. v. Richards, 152 Ill. 59, reported
also in 30 L. R. A. 33, with a luminous annotation.
Richards was patentee of a process for weighing grain
in bulk which was said to reduce the cost of weighing
and transferring it from one railroad car to another.
He had entered into a contract with the Lake Shore
Company and among the various terms was an agree-
ment by the company to adopt Richards' plan of weigh-
ing and transferring grain for all carloads of grain
which should come to Chicago over western railroads
for transportation eastward over the plaintiff's lines,
and to allow him one-half of the saving which the
device yielded.    The Lake Shore Company also
agreed not to make any use of the weights of such
carloads of grain except for the purpose of billing the
carloads through to destination.   This contract was
to last for a certain period, but in the interval the Lake
Shore Company breached it by not using the process
for weighing and transferring all carloads of grain
which came from western roads to pass eastward over
its lines, and also by using the weights of certain car-
loads ascertained by Richards' process for other pur-
poses than to bill the carloads eastward to destination;
that is to say, the Lake Shore Company gave the
weights to the western railroads over which the grain
had been transported to Chicago, thereby depriving
Richards of the benefit of selling the weights to said
western roads.   The breaches were only partial, for the
Lake Shore Company continued to use Richards' pro-
cess for some grain received by it; nevertheless they
were held to show an intention on the part of the Lake
Shore Company not to be bound by the contract, and
to defeat the consideration for which Richards had
entered into the contract, and hence sufficient to en-
title him to recover the profits that would have been
earned if the arrangement had been carried out in full.
The instructions approved in said case show the rules

of law the court deemed applicable to it and are suggestive of forms in instructions appropriate to the case at bar. The two controversies are alike in principle and the legal effect of the facts is the same in each.

From the foregoing pertinent and recent cases we conclude, that if a contract like the one in controversy is broken and the breach evinces an intention in the defaulting party not to be bound by stipulations whose non-observance will so far defeat the consideration for which the opposite party entered into the contract, that to make the latter keep the agreement will amount to coercing him to perform on terms which presumably he would not have accepted, he will be released from his obligation and may recover as though the contract had been carried out. See, too, West v. Moser, 49 Mo. App. 201, 211; Hinckley v. Steel Co., 121 U. S. 264; Easton v. Jones, 197 Pa. St. 147; Providence Coal Co. v. Coxe, 19 R. I. 380; Crowl v. Goodenberger, 112 Mich. 683; State v. Jones, 21 N. E. 510; Hughes v. U. S., 4 Ct. Cl. 64.

The remaining inquiry is whether the facts of the present case range it within those principles. To say these plaintiffs were bound to go on with the performance of the contract, though defendant had repudiated its obligation to accept D-stem handles, which obligation was part of the consideration that induced plaintiffs to enter into the contract and without which, presumably, they would not have entered into it, would require them to perform for another and less profitable consideration than the one they contracted for and are entitled to receive—would bind them by a contract they never made, which there is no reason to believe they would have made, and the execution of which likely would entail continual loss instead of profit, as a proportion of every lot of timber worked up would be wasted. We consider it manifest that if defendant rejected its obligation to take and pay for D-stem handles, as the triers of the fact might well find, this re-

nunciation went to the root of the consideration, amounted to an abandonment of the contract and relieved plaintiffs from their obligation further to perform.

The instructions granted on the second count indicate the court took this view, but the main one for plaintiffs was so drawn as to suggest that if the bare failure to take the one rejected carload forced plaintiffs to close their factory, plaintiffs might recover future profits. In this respect the instruction followed the petition which needs amending. Neither it nor the instructions expressed clearly the doctrine that plaintiffs must have been prevented from keeping their obligation by conduct of defendant showing it would refuse to accept D-stem handles if plaintiffs continued to manufacture and offer them.

Counsel for defendant contend if plaintiffs are entitled to recover for future profits, the measure of their damages would be the difference between the prices at which they sold to defendant and the prices which they could have obtained from other buyers. The law is otherwise, the measure of damages in such case having been established by several decisions of authority in this state; and applied to the facts of the present case, it is the difference between the cost to plaintiffs of manufacturing the handles and putting them on the cars and the prices they were to receive. [Black River Lumber Co. v. Warner, Chapman v. Railroad; Berthold v. Elec. Const. Co.; Gabriel v. Brick Co.; supra.]

III. We will consider next the counterclaim set up in defendant's answer to the contract of October 28, 1904. The answer says plaintiffs agreed to manufacture and sell to defendant during the time named in said contract, their entire output of long ash handles and start up their factory and make them; that defendant agreed to buy all said handles and pay designated

prices therefor when delivered free on board cars at Manila, it being estimated the factory would turn out from 600,000 to 1,000,000 handles; that plaintiffs neither sold or delivered nor offered to sell or deliver, any handles under said contract, though defendant was ready and willing to receive and pay for same; but plaintiffs wholly refused and neglected to comply with it; that had they complied, and operated their factory as they agreed, they would have turned out at least 600,000 handles and defendant would have realized a profit of six dollars per thousand or $3600, for which it prayed judgment. The defenses to said counterclaim set up in the reply were: First, that defendant failed to furnish plaintiff any specifications for the handles to be manufactured, though the contract required this to be done, and by reason of the failure plaintiffs were unable to manufacture handles, hence were not liable to defendant in damages; second, at the time of signing the contract and as a condition precedent to its taking effect, and part of the consideration for it, plaintiffs stipulated in writing defendant should pay plaintiffs for handles on hand the sum of $616, payment of which had theretofore been promised; that defendant failed, neglected and refused to pay said sum to plaintiffs or any part of it, by which plaintiffs were released from the performance of the contract to defendant and are not liable in damages on it; third, the contract of October 28, 1905, was obtained from plaintiffs through false and fraudulent representations made to deceive them, in that defendant promised to pay them over six hundred dollars for handles on hand, for which they had been seeking payment; the general manager of defendant sought an interview with plaintiffs, and, as an inducement to plaintiffs to enter into the contract of October 28, 1905, promised to receive and pay for said handles and relying on this promise plaintiffs signed the contract; defendant had no intention of receiving said handles and falsely agreed

to receive same in order to induce plaintiffs to sign the contract; thereafter defendant never received or paid for the handles; wherefore the contract was alleged to be of no effect and the court was prayed to decree it null and void. The instruction granted at plaintiffs' instance on the counterclaim, submitted those three defenses in the alternative and told the jury, in effect, if they found either of them had been established, defendant could not recover on its counterclaim. It will be perceived two defenses of a legal and one of an equitable nature, were united in a single count of the replication; which was bad pleading, but no objection was taken to it. However, as the reply asked affirmative relief in connection with the equitable defense, that matter should have been heard and determined by the court. [Wendover v. Baker, 121 Mo. 273, 25 S. W. 918.] Really the equitable plea and the legal defense that the second contract never went into effect because the condition precedent was not performed, rested on the same facts. The fraud alleged to have been practiced on plaintiffs as an inducement to enter into the contract and which rendered the latter void, was the promise of defendant to accept and pay for handles on hand, which was likewise the supposed condition precedent to the contract becoming operative. Both defenses ought not to be insisted on, but only the one best supported by the evidence. We have set out in the statement what Laswell testified about the execution of the second contract, and this testimony, in connection with the letter of defendant inclosing the copies of the contract and the letter of plaintiffs returning one copy executed, are all there is in the record about this matter. We find nothing in either from which to infer payment of the handles on hand was a condition precedent to the contract taking effect. The effect of what Laswell testified was that Durell said if plaintiffs would sign the contract for another year, he would give them shipping directions for the handles and they ex-

pected to get the price of the handles and reopen their factory with it. Durell's letter inclosing the copies for signature asked plaintiffs to sign them and said on receipt of a copy duly signed, defendant would give shipping directions for the handles about which they had been corresponding. Plaintiffs' letter returning a signed copy, asked shipping directions, saying plaintiffs could not start up until they got pay for the handles. It is plain these bits of testimony are insufficient to prove an agreement was made that the second contract should not go into effect until the handles plaintiffs had on hand were accepted. But the letter and the testimony, and, indeed, all that transpired between Laswell and Durell, very strongly incline to prove plaintiffs were induced to execute the second contract on the promise of Durell to pay for those handles. Plaintiffs had been trying for more than a year to get pay for them and defendant knew they could not resume operations until payment was made. Payment was the burden of the conversation between the two men at the Blythesville meeting. Promises of something to be done in the future are not always ground for the rescission of the contract; but where a promise is made under such circumstances as this one was, with no intention to perform it, but with a fraudulent design to obtain a contract by giving the promise and then breaking it, those facts are ground of rescission. [Bispham, Equity, sec. 211; 31 Am. St. Rep. 39; 38 Am. St. Rep. 116; 55 Am. St. Rep. 406; 87 Am. Dec. 738; Chicago, etc., R. R. v. Titterington, 84 Tex. 218, 19 S. W. 472; Wilson v. Eggleston, 27 Mich. 257; Grove v. McKee, 53 Miss. 536; 14 Ency. Law, pp. 15 to 54.] If plaintiffs are to be believed, and there is much to corroborate them, Durell knew the utter impossibility of their even beginning to perform the new contract until they were paid for the handles already made; and if he procured the contract by promising what he did not mean to keep, he intended to tie plain-

tiffs up in an obligation which, by his own wrong, he would prevent them from performing; thereby lay them liable in damages and enable defendant to escape the consequences of the breach of the first contract for which plaintiffs' attorneys were threatening to sue.

As regards the defense to the counterclaim that defendant never furnished any specifications for the handles under the second contract, suffice to say Durell testified he inserted all the necessary specifications in the contract and the attached schedule, and the testimony of plaintiffs themselves was inconsistent with the notion that they did not furnish handles under said contract because of a lack of specifications. The reason they assigned for not furnishing them was because, in their view, the contract was not binding.

The judgment is reversed and the cause remanded with leave to plaintiffs to amend the second count of the petition and their reply, if so advised, and with directions to the court to retain the verdict on the first count of the petition and retry the cause of action set up in the second count and in the counterclaim. All concur.