BIG MUDDY COAL & IRON COMPANY, Respond-
ent, v. ST. LOUIS CARTERVILLE COAL
COMPANY, Appellant.

St. Louis Court of Appeals, July 5, 1913.

1. **SALES: Construction of Contract: Delivery Upon Buyer's
Order.** A contract for the sale of six hundred cars of coal pro-
vided that a certain number of cars were to be delivered dur-
ing each of the several months enumerated. The course of
dealing between the parties revealed that they construed the
contract to mean that the seller was to ship only on the order
of the buyer, and during the first few months, the seller ship-
ped only the quantities of coal ordered by the buyer, although
they were less than the quantities which, according to the con-
tract, were to be delivered during such months, so that, at
the end of the last month mentioned in the contract, two hun-
dred and eighty-four cars had not been delivered. The buyer,
just before the end of the last month of the contract, demanded

the delivery of this number of cars, and, upon the refusal of the seller to accede to this demand, brought suit for breach of contract. *Held*, in view of the circumstances surrounding the parties and the construction placed upon the contract by them, that the provisions for delivery of the specified quantities each month will be construed to require the delivery of that quantity upon orders received during that month, and not to permit the buyer to order less than the specified quantity in the earlier months, when the price was low, and then require delivery of the balance just before the end of the contract term, when the price was high; and hence it is *held* that the buyer did not breach the contract.

2. **CONTRACTS: Construction: Intention of Parties: Evidence.** The intention of the parties to a contract must control in every instance, and, in arriving at their intention, evidence of the circumstances under which the contract was made is admissible, in order that the court may put itself in the position the parties were at that time.

3. ————: ————: **Reasonable Construction.** Where the language of a contract is obscure or ambiguous, so that it is fairly susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally make, while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable agreement.

4. ————: ————: **Mutuality of Obligation.** Stipulations in commercial contracts are usually treated as dependent and indivisible in imposing a duty to perform on both parties alike, for the reason that such construction conforms to the intention of business men, who are accustomed to depend on prompt compliance with engagements and who may be ruined by tolerating breaches.

Appeal from St. Louis City Circuit Court.—*Hon. Leo S. Rassieur*, Judge.

AFFIRMED.

*James R. Van Slyke* for appellant.

(1) The expressed terms of a contract govern the interpretation to be given to said agreement and the terms used are to be given their accepted meaning.

Webb v. Ins. Co., 134 Mo. App. 580; Rogers v. Modern Brotherhood, 131 App. 353; Donovan v. Beck, 217 Mo. 70; Lovelace v. Assn., 126 Mo. 104; Linseed Co. v. Eberson, 126 Mo. App. 426. (2) Where two contracts are executed for the delivery of the same commodity and overlap as to time, the law presumes the intention of the parties to be that the contract prior in date is filled by the commodity shipped if sufficient is shipped to fill the first contract and a breach, if any, will apply to the contract later in date. (3) This contract required respondent "to ship 300 cars of coal" during a definite period of time. There is no uncertainty or ambiguity in the terms used. Respondent having failed "to ship the 300 cars of coal" under the said contract has breached same and is liable for the damage sustained by appellant. Cases supra.

*E. T. & C. B. Allen* for respondent.

(1) The dominating factor in the interpretation of contracts is the mutual intention of the parties who made it, and that is to be collected from the words of the instrument itself, and the facts and circumstances that gave it birth, and also the interpretation given it by the parties. Wilson v. Wilson, 115 Mo. App. 649; Rose v. Carbonating Co., 60 Mo. App. 28; Williams v. Railroad, 153 Mo. 487. (2) The court, as far as possible, should put itself in the place of the parties to the contract, and then from a consideration of the writing itself, of its purpose and of the circumstances which conditioned its making, endeavor to ascertain what they intended to agree to do, upon what sense and meaning of the terms they used their minds actually met. Rope Co. v. Mayflower G. M. & R. Co., 173 Fed. 855; Bonding Co. v. Investment Co., 150 Fed. 17, 23; Accumulator Co. v. Railroad, 64 Fed. 70, 74; Salt Lake City v. Smith, 104 Fed. 457, 462; Fitzgerald v. Bank, 114 Fed. 474, 482. The intention when ascertained must control and be enforced without regard to

inapt expressions, or the dry words used. Rope Co. v. Mayflower G. M. & R. Co., 173 Fed. 855; Bonding Co. v. Investment Co., 150 Fed. 17, 28; Kaufman v. Raeder, 108 Fed. 171; Fox v. Tyler, 109 Fed. 258; Coal Co. v. Empire Co., 113 Fed. 259, 260; Prentice v. Forwarding Co., 58 Fed. 437, 443; Westervelt v. Mohrenstecher, 76 Fed. 118, 121; Tillitt v. Mann, 104 Fed. 421, 424; Salt Lake City v. Smith, 104 Fed. 457, 462; Tunnel Co. v. Mining Co., 141 Fed. 563, 567; Fidelity Co. v. Board, 145 Fed. 144, 148; Witt v. Railroad, 38 Minn. 122, 127; Driscoll v. Green, 59 N. H. 101; Johnson v. Simpson, 36 N. H. 91; Walsh v. Hill, 38 Cal. 481, 486. (3) Where a writing is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable contract. Rope Co. v. Mayflower G. M. & R. Co., 173 Fed. 857; Car Co. v. Railroad, 121 Fed. 609, 611; Coghlan v. Stetson, 19 Fed. 727, 729; Jacobs v. Spalding, 71 Wis. 177, 186; Russell v. Allerton, 108 N. Y. 288. (4) The contracts are silent as to capacity of cars to be shipped. Without shipping directions plaintiff could not load the cars. It could not tell how much coal was desired or where it was to be shipped. Laswell v. Handle Co., 147 Mo. App. 505-521; 1 Meachem on Sales, sec. 1123. (5) The interpretation of the contracts by the parties in the letters written and the 377 orders given show conclusively that it was intended that the plaintiff was not to load the cars except upon advice from defendant. The contract will be held to so provide. Cases supra.

NORTONI, J.—This is a suit on an account for coal sold and delivered to defendant, amounting to $2298.42; but the controversy arises on defendant's answer, which sets forth two counterclaims.

The answer admitted the indebtedness to plaintiff on account, as alleged in the petition, but set up separately two separate contracts for the purchase of other coal, and declared upon their breach. Because of such alleged breach, defendant prayed a recovery for several thousand dollars against plaintiff, by way of counterclaim.

A jury was waived, and the case tried before the court, which found the issue and gave judgment for plaintiff on its cause of action and against defendant on both of the counterclaims asserted in the answer. From this judgment defendant prosecutes the appeal, and urges that the court erred in construing the contracts set forth in the answer and relied upon as a foundation for its counterclaim. It therefore appears that the solution of the controversy depends upon a proper construction of the contracts mentioned, and, to this end, the facts and circumstances of the case should be fully stated.

Both parties to the suit are incorporated coal companies and so, too, is the Harman Coal Company, mentioned in connection with the contracts set forth in defendant's counterclaim. It appears that plaintiff is a Missouri corporation, engaged in operating coal mines at Herrin and Clifford in the State of Illinois, located on the Chicago, Burlington & Quincy Railroad. Defendant is engaged in both mining and selling coal at Herrin and Clifford, Illinois, and had agreed to sell the Harman Coal Company, its customer, a considerable quantity of coal to be delivered in consignments of so many cars per month, as stipulated in its contracts therewith. The relevant facts touching the controversy here appear in an agreed statement thereof in the record, and the contracts involved are to be interpreted and construed in the light of the facts and circumstances so revealed as attending the situation of the parties and the subject-matter contemplated at the time.

The first counterclaim set forth in the answer counts upon a contract of date June 14, 1909, whereby plaintiff agreed to ship and defendant agreed to receive 300 carloads of Carterville district lump coal, screened over a No. 3 screen, at mine price of $1.20 per ton, delivered on board Chicago, Burlington & Quincy Railroad cars at Herrin and Clifford, Illinois. This contract stipulates a shipment of the coal during the period between the 14th of June, 1909, and January 10, 1910, but provides as well "shipments to be made during the following months: July, 20 cars; August, 40 cars; September, 60 cars; October, 80 cars; November, 40 cars; December, 40 cars; January, 20 cars, total, 300 cars."

The second contract set forth in the answer and declared upon as matter of counterclaim is of date August 18, 1909, and stipulates that plaintiff agrees to ship and defendant agrees to receive 300 carloads of Carterville district lump coal, screened over a No. 3 screen, at mine price $1.20 per ton, delivered on board Chicago, Burlington & Quincy Railroad cars at Herrin and Clifford, Illinois. This contract provides for the shipment to be made between August 18, 1909 and March 31, 1910, and then stipulates "shipment to be made during the following months: August, 20 cars; September, 60 cars; October, 80 cars; November, 60 cars; December, 60 cars; January, 20 cars; total, 300 cars."

It is averred that plaintiff breached each of these contracts, in that it omitted and failed to ship to defendant, in all, under both contracts, 284 cars of coal, and for that damages are prayed to compensate the loss entailed upon defendant through its failure to realize profits on a resale of the coal.

By its reply, plaintiff admits the contracts, and admits, too, that it omitted to ship all of the coal contemplated in the contracts, but avers that it was under no obligation to do so unless the cars of coal were or-

dered by defendant during the months as above set forth. Plaintiff avers that it shipped each and every car of coal which defendant ordered, save in a few instances, where defendant canceled the order after it made it, and that therefore it fully complied with the obligations imposed upon it by the contracts.

Upon hearing the evidence and considering the agreed statement of facts, the court construed the contracts, in the light of the established course of business between the parties thereunder and all of the circumstances of the case, to impose no obligation upon plaintiff to load and ship the cars of coal except upon orders from defendant to do so, and therefore declared as a conclusion of law that, as plaintiff had shipped all of the coal ordered by defendant during the months specified, no breach appeared, even though 284 cars had not been shipped at all. The conclusion is obviously just in the circumstances of the case, and we believe, too, that it accords with sound law on the subject.

From the agreed statement of facts, it appears that both of these parties own and operate coal mines and are engaged in the business of selling and shipping coal to others. Besides operating a coal mine, it appears that defendant is engaged in buying coal as well and re-selling it to customers, as was the course pursued here. Defendant had contracted with the Harman Coal Company to sell and deliver to it a large quantity of coal, and communicated this fact to plaintiff before the contracts set forth in the counterclaim were entered into. The two contracts entered into between plaintiff and defendant, and also the two contracts which defendant entered into with the Harman Coal Company for the sale of coal to it, are set forth in the agreed statement of facts. From these several contracts and other evidence in the record, it is revealed beyond question that the two contracts entered into between plaintiff and defendant were to the end

of enabling defendant to fulfill its two contracts with the Harman Coal Company. By the contracts entered into between defendant and the Harman Coal Company, defendant agreed to sell and deliver to the latter 600 cars of coal. It is expressly agreed in these contracts that such coal is to be delivered by defendant to the Harman Coal Company in cars on the Chicago, Burlington & Quincy Railroad at the plaintiff's, Big Muddy Coal & Iron Company, mines in Illinois; moreover, that the deliveries are to be made, twenty cars of three-inch lump during the month of July, 1909, forty cars in August, sixty in September, eighty in October, forty in November, forty in December, twenty in January, 1910. Such is the stipulation of the first contract between defendant and its customer, the Harman Coal Company, and the second contract is in no material respect different. Indeed, the two contracts seem to be the same. Both of them provide that the Harman Coal Company shall pay defendant $1.25 per ton f. o. b. mine for the coal; all to be shipped from the mines of the Big Muddy Coal & Iron Company—that is, plaintiff's mines—in accordance with the direction of the Harman Coal Company, and bill of lading to be furnished with each car. To enable it to fulfill these contracts of sale, it appears that plaintiff and defendant entered into the contracts involved here. The two contracts between plaintiff and defendant and set forth in the counterclaims, except for the different dates and time, are the same. It is, therefore, sufficient to set forth one of them only. The first of these contracts is as follows:

"This contract made in duplicate this 14th day of June, 1909, by and between the Big Muddy Coal & Iron Company of St. Louis, Mo., party of the first part, and the St. Louis-Carterville Coal Co., of Herrin, Ill., party of the second part, for the period ending January 10, 1910.

"Witnesseth: The party of the first part agrees to ship and the party of the second part agrees to receive three hundred carloads of Carterville district lump coal, screened over a No. 3 screen, at mine price of $1.20 per ton, delivered on board C. B. & Q. cars at Herrin and Clifford, Ill.

"Mine weight to govern settlement and shipment thereafter at risk of consignee.

"Shipments to be made during the following months:

| | |
|---|---|
| July .................... | 20 cars |
| August ................. | 40 cars |
| September .............. | 60 cars |
| October ................ | 80 cars |
| November .............. | 40 cars |
| December .............. | 40 cars |
| January ................ | 20 cars |
| Total .............. | 300 cars |

"Terms: Cash on the 10th of the month for all shipments made during the preceding month.

"This contract is subject to the contingencies of transportation, strikes, labor troubles or causes beyond the control of the party of the first part.

    "Big Muddy Coal & Iron Company,
        "By S. L. SHERER, Ass't Sec'y.
"St. Louis-Carterville Coal Company,
    "By H. S. HADDAWAY, Sales Manager."

When this and the companion contract were entered into between plaintiff and defendant, it was well known to both parties that plaintiff had no way of storing the coal, but on the contrary raised it from the mines and dumped it over the screens into cars, where it was weighed and immediately billed out to the customer. It is agreed, furthermore, that plaintiff could obtain cars for the purpose of shipping only on request, which, according to the usual practice, was

made when orders came in for coal. Upon receiving such orders, the coal was mined, raised from the pit and dumped into the car, and immediately billed to the customer. Each and every car of coal shipped under these contracts was shipped to the Harman Coal Company—that is, defendant's customer—on an order from it to the plaintiff's mine superintendent in Illinois, and it appears that every car ordered was shipped in due time, unless it be in the case of a few cars where the orders were subsequently canceled before shipment was made. The course of dealing between plaintiff and defendant and the correspondence in evidence reveal beyond question that these parties construed the contracts to mean that plaintiff was to ship the cars of coal only on orders from defendant or its customer, the Harman Coal Company. Indeed, it appears that plaintiff supplied defendant with a book of printed orders to be filled out and mailed to its mine superintendent as coal was required under the contract. When such an order was filled out and mailed to plaintiff's superintendent at the mine, the number of cars requested were loaded and shipped and bill of lading forwarded in accordance with the contract between the Harman Coal Company and defendant. That defendant understood such was the course to be pursued under the contract sufficiently appears from its letter to plaintiff of date September 9th. In that letter defendant says: "Following up conversation with your Mr. Sherer relative to the size of the cars which can be applied on our business, would say, when it is absolutely necessary forty-ton cars can be applied on all orders whether for large cars or for small cars. It being understood that when you have the equipment you shall fill the orders as closely as possible in accord with instructions given on the face of the order." Plaintiff did not make any shipment under the contracts until defendant or its customer, the Harman Coal Company, had by order indicated the

date of the shipment, the capacity of the car, the consignee, the routing and the destination of the car and had verified in most cases the freight rate given.

It appears that all of the coal contracted for was not ordered during the months mentioned, and on January 26, 1910, defendant wrote plaintiff as follows:
"Dear Sirs:

"Since speaking to you over the telephone yesterday, I have checked over the number of orders which we have placed with your company for the month of January as follows: Orders placed 18, shipped 13, and 5 unfilled. Our contract for the month of January calls for 40 cars and after deducting 18, which is the number of orders placed for January, there is still a balance of 22 cars due and will ask that you change our order No. 370 for Galesburg, Illinois, to read 22 cars instead of 25 cars.

"You will note from the above figures that we do not consider orders placed with you in December and shipped in January as January orders."

This letter obviously suggests with great force that defendant understood the contracts to impose a monthly obligation on plaintiff to ship the number of cars set opposite the specified month, for it appears to concede that but twenty-two cars were due it on the January, 1910 orders, and corrected its prior order accordingly. As before said, plaintiff shipped as many of the cars of coal each month as defendant or its customer ordered, unless it be where such order was subsequently canceled, as in the letter last above quoted. Though it be that plaintiff had filled the orders as they came in monthly and though it be that defendant by its letter of January 22 had stated the account to be "still a balance of twenty-two cars due," it appears that on January 25th it wrote plaintiff demanding shipment of 275 cars of coal under the contracts, as though it were competent to accumulate all

of the shortages in the past which had accrued on account of its failure to order and enforce a delivery of the whole at that time. Plaintiff denied this right and wrote defendant that it was entitled to but forty cars for the month of January and orders for those had been accepted. Because plaintiff refused to ship the full number of cars of coal mentioned in the contracts—that is, a sufficient number to make up the entire 600 cars—defendant insists it is entitled to recover as for a breach of both.

It is argued that the contracts between plaintiff and defendant did not in terms require defendant to give shipping directions or order the cars of coal as needed. This may be true, but obviously such is implied when all of the circumstances of the case are considered, for it appears that the shipments were divided up in installments as by the month and no directions whatever provided as to whom the cars should be consigned. These contracts were entered into in contemplation of the contracts between defendant and the Harman Coal Company, requiring shipments from plaintiff's mines of a like number of cars per month in accordance with shipping directions to be given by the Harman Coal Company. It is true the contracts between plaintiff and defendant did not so state on their face, but it appears from the agreed statement of facts that such was the intention of the parties. No one can doubt this to be true, for a reading of the contracts between defendant and the Harman Coal Company and those between defendant and plaintiff reveal a connecting link. Obviously the parties so intended, and this being true, all of those contracts should be read together. Furthermore, it is agreed that both parties understood plaintiff had no means of storing the coal and that it was necessary for it to ship it immediately upon loading the cars. Until defendant or some one for it gave shipping directions, it would appear that no obligation to load and ship accrued. Indeed, the

contract imposes an obligation on plaintiff to ship the coal and on defendant to receive it, but, in the circumstances of the case, with which all were familiar, and, especially, when viewed in connection with the contract of defendant with Harman Coal Company, shipping directions were required. This being true, no breach appears until the cars were ordered shipped by defendant or its customer. [See Laswell v. National Handle Company, 147 Mo. App. 497, 126 S. W. 969.]

But it is urged that defendant requested a shipment of all of the cars of coal not theretofore shipped on its order or those of the Harman Coal Company before the contracts finally expired and, therefore, a breach of defendant's obligation appeared, for it refused to ship in all as many as 284 cars. Of this it is to be said, first, that it appears plaintiff shipped every car of coal requested during the several months mentioned in the contract, except in a few instances where the orders were canceled by defendant or its customer after they were received by plaintiff. The only reason defendant did not receive all of the coal is because neither it nor its customer ordered it shipped. In January, and shortly before the contract expired, defendant ordered 275 cars shipped at once and plaintiff declined to do so for the reason that forty cars was the number due for that month. These were shipped as the contract required. It appears from defendant's letter of January 22 that it, too, understood forty cars only were due for that month, for upon recapitulation, it canceled the order for twenty-five cars and merely requested "the balance due"—that is, twenty-two cars—which, when added to the eighteen theretofore shipped during the month, made up the sum total of forty cars for January.

But though such be true, it is argued the two contracts reveal an obligation on the part of plaintiff to ship 600 cars of coal and that the monthly allotments are not to be considered as of the essence of the agree-

ment but rather merely an arrangement for the accommodation of the plaintiff. Notwithstanding the contracts provide a certain number of cars shall be shipped each month, it is said the obligation to ship 600 cars of coal under the two contracts, on the request of defendant, continues intact. To so view the contracts and declare their force and effect would certainly entail a hardship on the plaintiff not contemplated by the parties at the time they were entered into. It sufficiently appears in the case that the price of coal was much higher in January and March, when defendant demanded a large number of cars of coal in the place of those it had not ordered theretofore, than it was in July before when twenty cars were due, August when it had a right to forty and September when it had a right to demand sixty cars, etc. While plaintiff was willing to accept $1.20 per ton for coal in those months, distributed as suggested, and could realize a fair profit thereon, it would forfeit all its profit and lose considerable besides to supply the 275 cars demanded on January 26 or the 284 cars said to be short in March. Obviously the parties did not intend such a result. In such circumstances, the time of delivery is to be regarded as of the essence of the contracts, for, otherwise, an undue hardship will be entailed. [Hull Coal & Coke Co. v. Empire Coal & Coke Co., 113 Fed. 256.]

The intention of the parties as revealed in the contract must control in every instance. In arriving at the intention of the parties to a contract, it is competent to receive and consider evidence revealing the situation of the parties at the time the contract was made and enlightening the subject-matter, so the court may view and understand the situation and the obligations assumed, precisely as they did. The court, so far as possible, should put itself in the place of the parties to the contract when their minds met upon the terms of the agreement, and then, from a consideration of

the writing itself, of its purpose and of the circumstances which conditioned its making, endeavor to ascertain what they intended to agree to do—that is, upon what sense and meaning of the terms they used their minds actually met. Moreover, where the language of a contract is obscure or ambiguous or where its meaning is doubtful, so that it is fairly susceptible of. two constructions, one of which makes it fair, customary and such as prudent men would naturally make, while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes it a rational and probable agreement must be preferred to that which makes it an unusual, unfair or improbable contract. [See Leschen & Sons Rope Co. v. Mayflower Coal Mining, etc., Co., 173 Fed. 855; Russell v. Allerton, 108 N. Y. 288; Jacobs v. Spalding, 71 Wis. 177.] When all of the facts and circumstances set forth in the agreed statement are considered, and, especially, the contract between defendant and Harman Coal Company, which expressly provides for the shipment of coal in the same number of cars monthly as that set forth in the contracts between plaintiff and defendant, it would seem to be inequitable and unjust to conclude these parties intended that all of the shipments which defendant had neglected to order when coal was at a lower price in the market could be accumulated and demanded at a time when the market price ranged much higher. It would seem that the statement of the facts and the proposition alone are sufficient to refute it.

It is true the contracts between plaintiff and defendant did not expressly set forth that the shipments of coal were to be made only in accordance with the number of cars set opposite to each month, but when all of the facts and circumstances of the case are considered, it is clear enough that such was the intention of the parties. Indeed, such contracts, when made as in the

circumstances of the case here and concerning a subject-matter like coal, to be mined from the earth and delivered immediately into cars for consignment, are regarded, though in one writing, as a set of contracts. In other words, such contracts in the circumstances stated seem to impose obligations for the months set out and specified with respect to the requirements of delivery and acceptance for each. [See Johnson v. Allen, 78 Ala. 387, 56 Am. Rep. 34.] Stipulations in commercial contracts are usually treated as dependent and indivisible in imposing a duty to perform on both parties alike, for the reason that such construction conforms to the intention of business men, who are accustomed to depend on prompt compliance with engagements and may be ruined by tolerating breaches. [See Laswell v. National Handle Co., 147 Mo. App. 497, 126 S. W. 969.] It is in this view that contracts of the character here involved are regarded as imposing mutual obligations on the parties, so as to require an order for coal in the instant case and this, too, during the month at which it was agreed to be shipped, before a breach of the contract may be asserted on a shipment omitted solely because it was not ordered. Obviously, another view of the matter would enable defendant to accumulate all of the omissions to ship as a single breach of an entire contract, even though such omissions were because of its fault in not ordering the coal, and thus mulct plaintiff as for a loss accrued when the market ranged most favorably to defendant's interests, and this, too, though the parties contemplated on entering the contract that the deliveries were to be made throughout a number of months, a portion of which when the market price was low as well as when it was high. The court did not err in construing the contracts as it did.

The judgment should be affirmed. It is so ordered. *Reynolds, P. J.*, and *Allen, J.*, concur.