### EVERETT v. EMMONS COAL MINING CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1923.)

No. 3755.

1. **Sales ⊂⟫23(4)—Written order and acceptance held to constitute contract for sale of coal.**

Where, on receipt of a written order for coal, the seller signed a written acceptance containing conditions and the statement, "If the conditions upon which we accept your order, as shown on the back hereof are not satisfactory, please advise us at once, and we will cancel order; otherwise, shipment will be made subject to these conditions," and the buyer admitted receipt of such acceptance before shipments were made, and without objection thereafter received shipments, the order and acceptance, with the conditions contained therein, constituted the contract of sale.

2. **Sales ⊂⟫82(1)—Right of seller to demand security.**

That a seller on terms of credit, on becoming doubtful of the buyer's credit, might require payment in cash as a condition of delivery, does not give him the right instead to demand a bond to secure the future payments.

3. **Damages ⊂⟫62(4)—Buyer held not required to mitigate damages by furnishing bond to seller on seller's unwarranted demand.**

Where seller unjustifiably requires a bond as a condition of continuing installment deliveries, buyer's duty to mitigate damages does not require him to give such bond.

4. **Sales ⊂⟫62—Contract for monthly deliveries of coal is separable.**

Contracts for coal with monthly deliveries *held* to be successive and separable contracts, defaults in which give rise to separate causes of action, rather than to surplus or deficiency carrying over into the next period.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Action at law by H. D. Everett against the Emmons Coal Mining Company. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

Everett (trading as "Western Coal Company," and hereinafter called the vendor) brought suit for the agreed price of coal sold and delivered by him to the Emmons Company (called vendee). The vendee answered, admitting this liability, but by cross-petition claimed the damages which it had suffered as vendee under a previous contract of the same character which the vendor had not fully performed. Upon the jury trial, the vendee had a verdict indicating that the greater part, if not all, of the damage claimed in its cross-petition had been allowed to it. Upon this review nothing is involved except the propriety of the cross-recovery.

In these transactions the vendor was acting practically as broker or

---

⊂⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

representative at Cincinnati for the coal mining operators, though this was not disclosed, and whatever vendor obligations the contract created were his. The vendee was a jobber of coal at Philadelphia, and engaged in the buying of coal and its resale and delivery at Norfolk for foreign shipment. April 1, 1920, the vendor telegraphed the vendee an offer of 5,000 tons per month for four months. April 2d the vendee telegraphed an acceptance. April 3d the vendee's representative in Cincinnati and vicinity, engaged in buying for it, and who was dealing with the vendor regarding a previous contract between the same parties then in the course of execution, came into the vendor's office and was there shown these telegrams. He then took one of vendee's customary order forms, filled it out as "Order 5562" to cover this transaction, and delivered it to the vendor. The vendor thereupon filled out and signed one of his customary acceptance forms, which he marked "Acceptance No. 1713." What was then done with this acceptance is not quite clear. The vendor says it was delivered to the vendee's agent who either put it in his pocket or in the mail for transmission to Philadelphia. The agent denied receiving it. However a copy of it was attached as "Exhibit A" to the vendor's answer to the vendee's cross-petition, which answer alleged that "Exhibit A" was sent by mail on April 3d to the vendee; and the vendee's reply to this answer "admits that on or about April 5th it received a copy of the document attached to the reply [answer] marked Exhibit A." Copies of order 5562 and of acceptance 1713, so far as they are material, are given in the margin.[1]

---

[1] Order No. 5562.

This order supersedes all previous verbal or written communications and contains the final agreement. If not in accordance with understanding, kindly return at once.

*April 3, 1920.*

To *Western Coal Co., Union Central Bldg., Cincinnati, O.:*

Ship to *Tidewater Coal Exchange, Pool No. 5, a/c Emmons Coal Mining Co. "for export."*

Destination, *Newport News, Va.*

Routing, *C. & O.*

Quantity, *Five thousand (5000) tons per month for April, May, June and July, 1920.*

Kind, *Logan M. or R.*

Commence shipments *at once.*

At rate of *5,000 tons per month.*

Period *from April 1, 1920 to August 1, 1920.*

Price, *$5 per net ton f. o. b. mines.*

Freight rate, *C. & O.—Logan rate.*

Notice to us *Philadelphia Norfolk.*

Bill to us *Philadelphia.*

Remarks: *Payment to be made on 15th of month following shipment; and on such coal as weights are not available, payment to be made at $250 per car.*     *Emmons Coal Mining Company.*

         WBC.

*Acceptance No. 1713.*

       Cincinnati, Ohio, *April 3, 1920.*

*Emmons Coal Mining Co., Philadelphia, Pa.* Gentlemen:

We thank you for your order from *Mr. Coddington* to-day, which we are entering subject to conditions printed on back hereof and for shipment as shown below:

Consignee, *Tidewater Coal Exchange, Pool No. 5, a/c Emmons Coal Mining Co. "for export."*

Destination, *Newport News, Va.*

Route, *C. & O.*

Quantity and kind, *Five thousand (5,000) tons per month for April, May, June, and July, 1920; 20,000 tons available.*

To be shipped, *beginning at once.*

Price *$5 net ton f. o. b. cars at mines.*

If the conditions upon which we accept your order, as shown on back

The agreed April deliveries were 1,500 tons short. This shortage is said to be excused for reasons which have now become immaterial, since the market price did not rise during that month, and the vendee bought the coal elsewhere for the same price and was not damaged. During May the vendor made no shipments, and it is claimed that the market price increased 10 cents per ton, and therefor the vendee claimed $500 damage. In

hereof, are not satisfactory, please advise us at once, and we will cancel order; otherwise, shipment will be made subject to these conditions.

Yours very truly,                                    Western Coal Company,
                                                         By

Note.—It is understood that payment is to be made on the 15th of each month for all coal shipped previous month, and on such coal as weights are not available, payment to be made at $250 per car.

### (On back of Acceptance)

### Conditions for Sale and Delivery of Coal.

(1) Terms of payment, cash on or before the 10th of each month for all coal shipped during the preceding month. Bills subject to sight draft if not paid when due. Terms of payment being essence of this contract, noncompliance therewith shall give seller privilege of cancellation, and waiver in any case shall not be construed as destroying this right, and also the right to cancel this contract is especially reserved in the event the seller has reason to believe that the credit of the buyer is impaired.

(2) The deliveries under this contract are subject to car supply, strikes, labor agitations or disturbances and causes otherwise beyond our control; that, in addition to this contract, the seller has executed and may from time to time further execute such additional contracts as will furnish it with a market for its entire estimated product and that in the event the seller shall at any time for any cause, be unable to deliver to its customers the entire tonnage called for by its contracts with them then in force, the total tonnage of the seller then available shall be applied on all of said contracts, in proportion to the amounts severally called for by them, and the amount deliverable under this and all of said contracts shall be reduced accordingly, and there shall be no liability on the part of the seller for the reduction so made; and when it becomes necessary to thus prorate shipments, it is understood and agreed the official car allotment and car percentage kept by the railroad company shall be used as a basis. In case of strikes or accidents unavoidably causing stoppage or partial stoppage of the works of the purchaser, delivery herein contracted may, upon request of the purchaser, be suspended or partially suspended during such stoppage.

(3) In case of failure by the purchaser to order or accept this coal as agreed, the sellers may during the term of this contract reduce the said tonnage the quantity the purchaser failed to order or accept, and also reduce the tonnage a like amount during any other equal period of this contract, provided such failure of the purchaser is not excused by the above conditions as set out in paragraph 2.

(4) Actual railroad weights as ascertained by initial lines are to govern settlements.

(5) The contract price is based on the present total cost of producing coal at the mines (the estimate of the cost of coal by the seller to be unquestioned by the buyer), and the railroad freight rate from the mines to the point of f. o. b. delivery, but if either or both of these rates or costs be changed during the term of this contract, then the price shall be changed accordingly on the tonnage which may be delivered under this contract, during the period the changed rate or rates, or cost are in effect—i. e., should there be any increase in the foregoing rate or rates, or cost during the term of this contract, purchaser is to pay for same; should there be any decrease, purchaser is to have benefit of same.

(6) The buyer shall look to the carrier for any loss or damage in transit; the seller assumes no responsibility for change in freight rates or delays in transportation.

June there were no shipments, and the market price had risen $3.60 above the contract price, whereby the vendee suffered damage of $18,000. The July shipments were all made.

Walter K. Sibbald, of Cincinnati, Ohio (Stuart R. Ducker, of Cincinnati, Ohio, on the brief), for plaintiff in error.

Wm. J. Conlen, of Philadelphia, Pa., and Albert H. Morrill, of Cincinnati, Ohio (Conlen, Acker, Manning & Brown, of Philadelphia, Pa., and Nichols, Morrill, Stewart & Ginter, of Cincinnati, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). The first controversy between the parties at the trial was as to whether acceptance 1713 was binding upon the vendee in all its terms, and thus became, with order 5562, the contract between the parties, or whether the contract was composed of the telegrams and order 5562. The Court left this to the jury, and since the excusatory clauses upon which the vendor relied as reasons for nondelivery were contained solely in acceptance 1713, and since the jury gave a verdict for practically the full amount claimed by the vendee, the verdict really may have been based upon the theory that acceptance 1713 was not a part of the contract, instead of upon the theory that the vendor had not successfully justified under these clauses. There were no express exceptions to the charge of the court in this respect, but there had been objection and exception when the telegrams were received in evidence, and this was another phase of the same question. Ordinarily it might not be error to receive at the opening of the trial the first communications between the parties which resulted in the contract, because it would be too early to pass upon the determining question; but here the pleadings had admitted the receipt of this acceptance by the vendee and its receipt of subsequent shipments. Further, this question was treated during the trial by the parties and the court as a vital question, and we think the alleged error on the subject should be taken as sufficiently saved by the exception with regard to the telegrams.

[1] The undisputed facts make it clear to us that the only contract between the parties was constituted by order 5562 and acceptance 1713. The two telegrams did not make any contract. The one of acceptance, according to its conceded intent, changed the time of the proposed delivery. Some essential details were not specified at all. Since these telegrams amounted but to negotiations and not to a contract, vendee's order 5562 only stated the existing legal rule when it said:

"This order supersedes all previous verbal or written communications and contains the final agreement. If not in accordance with understanding, kindly return at once."

The telegrams being thus superseded, there never was any written acceptance of order 5562, unless it was by acceptance 1713. This not only stated that the order was entered "subject to the conditions printed on the back hereof," but further expressly said:

"If the conditions upon which we accept your order, as shown on the back hereof, are not satisfactory, please advise us at once, and we will cancel order; otherwise shipment will be made subject to these conditions."

289 F.—44

The vendee admits receiving this acceptance, and it continuously thereafter demanded and received shipments under the contract. In all the correspondence involving reliance upon two or three of these excusatory conditions, the vendee never expressly denied that they constituted part of the written contract, although it did protest against their application, as being demands unjustified by the facts. Further, it is to be noticed that, when the vendee later gave a bond to secure the performance of the contract by it, it identified the contract between the parties as having been made April 3d. To the suggestion that there must have been a contract before April 3d because there was a shipment on April 1st, it is to be replied that on April 1st there was another contract between the same parties in the course of execution by shipment, and that the accountant's statement shows allocation of the April 1st shipment to this earlier contract. We conclude that the vendor was entitled to have the case tried as upon the contract made by the order and acceptance of April 3d, and that there was error in this respect. There must be a new trial; but the questions which have been argued, and which will probably arise again, should be considered.

The vendor's justification for not shipping during May is that an increase in the price of coal at the mines had required an increase of 40 cents per ton in the contract price under condition No. 5 of the acceptance, and that until May 19th the vendee refused to concede this advance. This condition being a part of the contract, and the proofs on the trial being apparently undisputed that the advance at the mine had occurred, the vendor's reasons up to this time seem to be sufficient; and the trial court was of that opinion. On the 19th the vendee conceded the point, and seemingly it would then be the vendor's duty to make shipments during the remainder of the month. He escapes this conclusion by saying that the vendee was in default on and after May 15th in paying fully for the April shipments. The matter was sent to an auditor to state the account between the parties. He reported a composite account showing the dealings under this order and one earlier and two simultaneous ones, saying that it was impossible to apportion the payments. Accepting this conclusion, it would seem that a composite default under all the orders and in a substantial amount existed during the remainder of May and justified nonshipment; and this was the opinion of the trial judge.

To justify nonshipments in June, the vendor says that about June 1st he came to have reason to believe that the vendee's credit was impaired, and he therefore proposed to cancel the contract under condition No. 1, unless the vendee would give him satisfactory security, and that the vendee delayed doing this until June 23d. He also urges that default in payment continued during this period. Whether this latter contention is good to any substantial amount, depends upon the disposition made of cars which had been charged against the account of the vendee by the vendor but which were confiscated or diverted and never reached the vendee. The debit balance carried on vendor's books from June 1st to June 23d, which was in fact on account of such cars, was relatively so small, and was so far subject to good-faith dispute, that we think it an unsatisfactory and insufficient basis for a refusal to

ship during that period. As to dissatisfaction with the vendee's credit the criterion would be whether the vendor did have substantial reason to believe it was impaired, and made the claim in good faith. That will be a question for the jury upon the trial to be had, if there is conflicting evidence. Upon the proofs in this record, showing the extent and character of the information which came to the vendor, there seems scant, if any, reason to doubt his good faith. The fact that the vendee carried continuously large bank balances was not inconsistent, not only because it was not brought to vendor's knowledge, but in view of the vendee's very large business the balances may have been insufficient to go around.

For the remainder of the month of June, it is said that a railroad embargo prevented shipment. If true, this is good reason, under condition No. 2 of the acceptance. The subjects of this embargo and its effect, and of the burden of getting the necessary permits which would allow shipments even before the embargo, and of where, under this contract, the duty lay as to providing cars for shipment, and as to how much coal should have been shipped in this month after the 23d if the embargo defense failed, may well be left to the new trial. The record then may be more complete than it is now.

[2, 3] The vendor contends that, even if its demand for security was unjustified, yet it became the vendee's duty to give the bond, under the rule which requires a vendee to mitigate damages and by analogy to the cases holding that where the vendor refuses to allow the contract term of credit, but requires payment in cash, and the only damage caused to the vendee is the interest during the credit period, it is his duty to pay cash (Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117; Lawrence v. Porter [C. C. A. 6] 63 Fed. 62, 11 C. C. A. 27, 26 L. R. A. 167), and this question may arise again. This rule of mitigation is not applicable to the facts of this case. The demand for a bond not only involved possible, far greater injurious consequences to the vendee than a mere insistence upon cash payments would carry, but the demand was made as if of right, and an unconditional compliance with it would have been a waiver of any claim for the damages or costs caused by the compliance. Hence the duty to mitigate in this manner did not arise. Campfield v. Sauer (C. C. A. 6) 189 Fed. 576, 111 C. C. A. 14, 38 L. R. A. (N. S.) 837. A conditional compliance, reserving the claim for its cost, would have been subject to rejection by the vendor.

Nor was the vendor's breach of duty to ship during the first 23 days of June—to the extent that there was such a duty, if at all—because of an unjustified bond requirement, necessarily waived or abandoned by furnishing a bond on the last-named date. Conceding for the purposes of the opinion that such a waiver would result, in the ordinary case of compliance with an unjustified demand, and that the cost of the compliance would become the measure of damages, the concession would not reach this case. The remaining 7 days of the month might have been wholly insufficient to allow full performance. In this case, as it turned out, the delay prevented any further performance. At the most there could be drawn from the giving of the bond no intent to

waive damages on account of such deliveries as it could not be reasonably anticipated would be made during the remaining opportunity. The facts on this subject are not sufficiently brought out upon this record for a satisfactory decision, and the question will not arise upon the new trial unless the demand for a bond should be found unjustified.

[4] In the court below, it was finally thought that, in so far as the nonshipments in June might be justified, the duty was carried over until July, at which time the measure of damages for nonperformance was at least as great as that appearing for June. Of course, such carrying over from June until July would occur if agreed upon (Consolidation Co. v. Portland Co. [C. C. A. 6] 272 Fed. 625, 628), no matter whether the agreement was express, or was implied from all the circumstances, including any interpretation put upon the contract by the parties. Whether there was any evidence indicating such agreement, we cannot say. Early in June the vendor indicated an intention to ship the May quota; in the bond of June 23d the vendee conceded that only the June and July shipments "remained to be furnished." Some correspondence in the last days of June as to making shipments elsewhere than to Norfolk may refer to the June shipments or to the July shipments to be made. Upon the new trial this can be determined, if it is then in doubt. We think no such duty arose by law from the contract itself. Contracts contemplating period deliveries are held to be successive and separable contracts, defaults in which give rise to separate causes of action, rather than to surplus or deficiency carrying over into the next period, or are held to be unitary, in each case according to the properly deduced intent of the parties. Contracts for coal with monthly deliveries are peculiarly susceptible to the former construction. Indeed, it has been said of them:

"Time is therefore of material importance in this class of contracts, both as to sales, delivery, and payments." Hull Co. v. Empire Co. (C. C. A. 4) 113 Fed. 256, 260, 51 C. C. A. 213, 217.

And also:

"Indeed, such contracts * * * concerning a subject-matter like coal, to be mined from the earth and delivered immediately into cars for consignment, are regarded, though in one writing, as a set of contracts." Big Muddy Co. v. St. Louis Co., 176 Mo. App. 407, 158 S. W. 420.

Regardless of how far this distribution into periods must necessarily be made in contracts of this class as a general rule, we think there is no escape from it in this case, if we consider only the face of the papers. This contract was not for 20,000 tons to be shipped in monthly instalments; it was for "5,000 tons per month for April, May, June, and July." [2] It is thus distinguished from contracts which call for a gross total, and so far as we observe from every contract which has been held to be unitary. We think the natural inference of intent to make four separable contracts is supported if not required by the provi-

[2] We cannot take the statement in the acceptance "20,000 tons available" to mean more than that the vendor would have that total available to meet the contract demands arising pursuant to the contract—not that he would keep it available somewhat indefinitely. We see in it no tendency to defeat the separable construction.

sions of condition 2 for prorating shipments, which could be carried out with difficulty, if at all, if delinquent shipments were to accumulate against another period; by the provisions of condition 3, which provide that if the vendee does not take the full amount during any period the vendor may cut down the contract proportionately for any other equal period; and by uniting all shipments for one month in one maturity and payment. Looking beyond the language of the contract into the circumstances, we observe that both parties doubtless understood that the problems of mining production and car supply called for placing a definite and not a fluctuating duty upon the vendor; that the vendee might be presumed to have ships under charter which could not endure delay; that large accumulation in storage at the dock to compensate for irregular shipments would be impracticable; and that to fix definite obligations upon such large quantities in a notoriously fluctuating market and extending, if more than four months, then for a wholly indefinite period into the future, would be somewhat improbable. Nor is the case analogous to those where the delivery is only part of the contract obligation, and where an impossibility of delivery may therefore only postpone that part of the performance, leaving the other obligations unimpaired. Here the vendor's whole duty began and ended with delivery and was measured thereby. There was no pervading general duty which could carry the delivery duty as a postponed incident. Further, the contrasts found in condition 2 are significant. The deliveries by vendor are *subject to* causes beyond his control; but if there is unavoidable stoppage of the vendee's requirements, the deliveries are to be *suspended during such stoppage.* From all these considerations it follows that, unless there was an express or implied agreement to the contrary, any default existing at the end of June was fixed, the cause of action therefor had arisen, and the measure of damages was to be determined as of a June date.

The judgment is reversed, and the case remanded for further trial.